Alastair KYLE, Petitioner-Appellant,

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

No. 115, Docket 26359.

United States Court of Appeals
Second Circuit.

Argued Oct. 31, 1961.

Decided Nov. 29, 1961.

Eugene Feldman, New York City, for appellant.

Joseph J. Marcheso, Asst. U. S. Atty., Brooklyn, N. Y., Joseph P. Hoey, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for appellee.

Melvin L. Wulf, New York City (Rowland Watts, New York City, of counsel), for American Civil Liberties Union, as amicus curiæ.

Before CLARK, HINCKS and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This criminal case first came before this Court on appeal from a judgment

convicting petitioner and others of conspiracy to violate the mail fraud statute, 18 U.S.C. §§ 371, 1341 and 1342, and of substantive violations thereof, 257 F. 2d 559 (2 Cir. 1958), cert. denied, 358 U.S. 937, 79 S.Ct. 327, 3 L.Ed.2d 308 (1959). It came here again on appeal from the denial, without an evidentiary hearing, of an application under 28 U.S. C. § 2255 to vacate the sentence, 266 F.2d 670 (2 Cir. 1959). Both appeals were unsuccessful. The case now comes to us on appeal from an order denying a second application under § 2255, again without an evidentiary hearing. Another panel denied a motion by the Government to dismiss the appeal as moot because appellant had served his sentence, 288 F.2d 440 (2 Cir. 1961).

The basis of this second § 2255 application was the Government's alleged suppression or loss of certain correspondence which petitioner claimed to have turned over to it, a claim which had also been asserted on the appeal and had constituted one ground of the first § 2255 proceeding, 266 F.2d at 671–672. We hold that new facts alleged in the second application, not previously knowable, put the matter in a sufficiently different aspect that a hearing should have been held.

The nature of the alleged mail fraud was, briefly stated, the taking of subscriptions for a toy-a-month club, under circumstances in which the defendants knew they could not make good. In June, 1956, before his indictment, petitioner turned over to the Government various books and records of his company, Toys of the World Club, Inc.—these including communications from European toy manufacturers, especially one H. Gessele of Salzburg, and, allegedly, copies of communications from petitioner to them, the copies being appropriately interleaved with the originals. In the proceedings before the Grand Jury, the Assistant District Attorney introduced only the letters from Gessele, without those from petitioner to him; petitioner alleges the Assistant made no answer to petitioner's claim that the Government had

the rest of the letters and was acting in bad faith in introducing only those that had moved westward.

In September, 1957, the same Assistant United States Attorney opposed a motion by petitioner to take the depositions of Gessele and an Italian manufacturer, Maino, on the ground that "Upon information and belief all of the dealings of defendants * * * with Messrs. Gessele and Maino were reduced to writing and your deponent further informs the Court that copies of the same are in the possession of the United States Attorney's office having been furnished to it by the defendant Kyle." On the basis of this representation, which surely could have been understood to include the eastbound letters if those had been among the papers turned over, and of an offer by the Government to stipulate that Gessele and Maino would testify substantially as claimed, petitioner abandoned his motion and, at the beginning of the trial, entered into two stipulations with the Government, one that Gessele and Maino would identify certain communications from them, and the other that they would testify in a manner therein set forth, both stipulations making the usual reservation of the right of the parties to offer other relevant and competent evidence.

The trial took a turn somewhat surprising in the light of this background. When the Government first introduced some of the Gessele letters on November 7, Kyle's counsel suggested that in fairness copies of Kyle's letters evoking them should also be before the court—"I assume, I am sure, the District Attorney has the full correspondence." The Assistant United States Attorney replied, "No, I do not, your Honor." The court suggested that defense counsel ask formally for production of the letters, counsel did, and the Assistant United States Attorney said that what he had introduced was all he had—"At least, I know of no other." The next afternoon, Kyle's counsel complained again about the Government's failure to produce the eastbound letters. The court said it had

told counsel he could examine the documents in an adjoining room. Counsel answered, "I did." Minutes later, after the Assistant United States Attorney had remarked, "I never have seen any such letters," counsel again stated that he had searched the files and had found nothing. The colloquy continued intermittently for the rest of the day, counsel repeatedly asking the court to order the Government to produce the letters. The Assistant United States Attorney stated, *inter alia*, "I don't know about those letters, as I said. If there were those records, they were free to pull them out." Finally, the court said the best thing would be if everyone took another look. On November 18 defense counsel again demanded production of the eastbound letters, to which the Assistant United States Attorney replied, "I have no such correspondence" and the court said, "Apparently it is not here." The case was submitted to the jury on November 19, no further reference to the eastbound communications having been made.

Petitioner's brief on appeal referred to the alleged disappearance of the Gessele letters only as one item in a point relating to insufficiency of the evidence; the Government's brief sought to dispose of the matter in a footnote mainly to the effect that if the eastbound correspondence "was helpful to appellants, they presumably would not have stipulated only part of the correspondence," an argument ignoring the rather obvious point, presented in petitioner's reply brief, that "the defendants did not feel it necessary to stipulate that their own letters had been written by them." This Court did not discuss the issue in its opinion. This was natural in view of the rather slight emphasis petitioner had given to the point, and also because, on the basis of what the Court then knew, it was quite as reasonable to think that the copies of Kyle's letters had never been in the file, or that, if they had been, Kyle's own attorney had removed them, as that the Government had lost or suppressed them. The only new material added by the first § 2255 motion was an offer to furnish testimony of petitioner's office manager that the letters had been in the file when turned over to the Government. There was also an affidavit of an attorney for a co-defendant that the letters had been seen at the District Attorney's office as late as September, 1957—a claim of which the judge had been apprised at the trial. Even with this testimony, there was still no substantiation of the claim that the letters were in the Government's possession rather than in petitioner's at the time of the trial; and in any event the testimony had been equally available then. This Court affirmed the denial of the motion primarily on the latter ground, 266 F.2d at 672.

The instant motion brought forward further facts. Mrs. Kyle averred that, at the time of the trial, then being Kyle's fiancée, she, on November 13, assisted his attorney in searching the files made available by the Assistant United States Attorney, observed the attorney examine the files without finding the letters to Gessele, herself looked under the letter "G" without finding a Gessele folder, and then "went slowly through every single paper in the whole file," with a similar negative result. An attorney associated in the first § 2255 motion swore that, with trivial exceptions, none of petitioner's letters to Gessele were in the file in December, 1958. These affidavits alone would not have advanced petitioner's cause; for, although more specific on the issue of the absence of the letters from the file at the time of trial than anything presented theretofore, Mrs. Kyle's evidence was surely available at the trial and on the first § 2255 motion, and the attorney's on the latter. However, and this is the heart of the case, the second motion also alleged the following: After his release on parole, Kyle discovered a memorandum decision, 20 F.R.D. 417, 419 (E.D.N.Y.1957), which, in denying a motion for the return of the papers Kyle had given the Government, had directed the United States Attorney to deliver a receipt specifying the documents

being held by it; Kyle sought to have the United States Attorney and the Assistant adjudged in contempt for failure to do so. Thereupon, the chief of the criminal division invited Kyle to reinspect the files. Mr. and Mrs. Kyle did this in the District Attorney's office and in the presence of two of his secretaries. "The missing folder, containing in all 105 papers, was prominently and correctly filed under the letter 'G' in such a way that no one who was looking for it could fail to find it almost immediately," and some of the papers contained notations in the Assistant United States Attorney's handwriting.

The Government opposed the motion on the grounds that petitioner should have "raised and pushed" the issue earlier, that the copies of the letters would not have helped him in any event, and that if he had deemed them essential, he could have obtained the originals from Salzburg. Chief Judge Bruchhausen denied the motion with an oral opinion, rendered after argument but without an evidentiary hearing. He relied primarily, although not solely, on the Government's argument as to immateriality.

 Save for that consideration, which we pass for the moment, a hearing ought to have been granted. There can no longer be any doubt that the copies of the letters existed and, if petitioner is able to establish the facts alleged in his motion and the accompanying affidavits, as he well may be, hardly any that the letters were in the files transmitted to the Government and were somewhere in the Government's possession throughout the trial, but that petitioner could not then discover them by careful file search. We have recently called attention, in a very similar context, to "the evidentiary principle that the subsequent existence of a fact supports the inference of its earlier existence, when the subsequent condition is one which ordinarily would not exist unless it had also existed at the earlier time," United States v. Consolidated Laundries Corp., 291 F.2d 563, 569 (2 Cir. 1961). Here the interval between the trial and the appearance of the papers in the Government's files was longer than in that case, but the inference remains quite strong enough to entitle the petitioner to a hearing under § 2255; still reserving materiality for further discussion, "the files and records of the case" do not "conclusively show that the prisoner is entitled to no relief." Although normally a court is not required to entertain a second motion under § 2255 alleging the same infirmity as the first, "such motion should be disposed of in the exercise of a sound judicial discretion," Hallowell v. United States, 197 F.2d 926, 928 (5 Cir. 1952). Here the appearance in the Government's files of the letters, the possession of which it had disclaimed at and after the trial, sufficiently altered the situation since the denial of the first motion to demand evidentiary inquiry. True, the hearing might show that the Government had merely been negligent and perhaps not even that, but it might also show considerably more. Hence it would be premature to consider whether if the testimony were to show only negligence in the handling of material evidence, petitioner would be entitled to relief under § 2255, as Consolidated Laundries held a defendant to be on a motion for a new trial.[1]

The question as to materiality is troublesome, both because petitioner's

---

1. In United States v. Consolidated Laundries Corp., supra, 291 F.2d at 571, the Court stated it did not feel called upon to decide whether the unfairness involved in negligent loss of material evidence by the prosecution "is so fundamental as to amount to a denial of due process of law" and based the grant of a new trial upon its duty to supervise the correct administration of justice in the federal courts. Section 2255 is not limited to cases where the sentence was imposed "in violation of the Constitution or laws of the United States" but includes the more general phrase "or is otherwise subject to collateral attack," the boundaries of which have not been defined, save, of course, that "mere error" is not enough.

factual showing is rather weak and because the applicable legal standard is not altogether clear and, as we shall see, may depend in some degree on what in fact happened to the documents.

As will be seen from the summary in this Court's first opinion, 257 F.2d at 561–562, the Government's case, largely uncontradicted, was impressive, perhaps even crushing. Petitioner claims the missing letters would have assisted in the cross-examination of the prosecution witness Hill as to nonpayment for various shipments, would have substantiated petitioner's testimony as to certain payments, and would have tended to negate testimony casting doubt on the correspondence having the content claimed by Kyle, compare Curran v. State of Delaware, 259 F.2d 707, 712 (3 Cir. 1958), cert. denied, 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959). The Government did not contend that Kyle was a hardened criminal but rather, as the judge said in denying the instant motion, "a young man in a hurry." In such a case rather small pieces of evidence may bear, in a not altogether insignificant way, on the crucial issue of intent. The colorless stipulated statement of what Gessele would have said if called as a witness was not a satisfactory substitute for the contemporaneous correspondence, on the availability of which petitioner's counsel asserts he relied in entering into the stipulation; and neither would secondary evidence of the contents of the correspondence have been.

Giving due weight to all this, we still would be a long way from concluding that the missing correspondence "is so material that it would probably produce a different verdict, if the new trial were granted," Berry v. State, 10 Ga. 511, 527 (1851)—the test that would apply if petitioner had excusably mislaid the correspondence and had moved for a new trial on finding it. And, on the showing made thus far, it would require minds more indulgent than ours to believe that the missing correspondence would have met the less rigorous standard of Larrison v. United States, 24 F.2d 82 (7 Cir. 1928), that the newly discovered evidence *might* have produced a different verdict—a test that has been stated to be limited to cases of "recantation or where it has been proved that false testimony was given at the trial," United States v. Hiss, 107 F.Supp. 128, 136 (S.D.N.Y. 1952), aff'd, 201 F.2d 372 (2 Cir.), cert. denied, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953), citing United States v. Johnson, 142 F.2d 588, 591 (7 Cir. 1944); see United States v. Costello, 255 F.2d 876, 879 (2 Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958)—assuming as we do that "might" means something more than an outside chance although much less than the "would probably" of the Berry rule.

Although the problem before us is different in two respects from those to which the Berry and Larrison standards were addressed, we have nevertheless thought the reference useful since one of the respects makes petitioner's position more favorable than that of an applicant for a new trial on the basis of newly discovered evidence and the other may make it less. The first is that petitioner alleges not merely that something new has turned up since the trial but that something wrong was done there; the second is that his attack on the judgment is collateral rather than direct. Yet, even without regard to the second factor, 28 U.S.C. § 2111 requires that "the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." The Supreme Court construed a somewhat differently worded predecessor of that section, 40 Stat. 1181 (1919), to mean generally that "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand, * * *" Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L.Ed. 557 (1946)—a formulation probably not very different in practical effect from the Larrison test as

to certain types of newly discovered evidence. If we could be sure that the test we have just quoted would be the one applicable here, we should doubt it had been met.

However, the sentence from Kotteakos continues, "except perhaps where the departure is from a constitutional norm or a specific command of Congress." For the latter the opinion cites Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939); as to the former it says, in a footnote, "Thus, when forced confessions have been received, reversals have followed although on other evidence guilt might be taken to be clear," citing cases, notably Malinski v. People of State of New York, 324 U.S. 401, 404, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). See also Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed. 2d 760 (1961). The Bruno case held the predecessor of 28 U.S.C. § 2111 not to apply where the error was the refusal to give a requested charge that a criminal defendant's not taking the stand might not be taken against him—a refusal deemed inconsistent with the Act of March 16, 1878, 20 Stat. 30, now 18 U.S.C. § 3481; and the recent case of Stewart v. United States, 366 U.S. 1, 9–10, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961), particularly when read in the light of the dissenting opinions, shows how strict the standard of harmless error is in this area, which lies close to the Fifth Amendment guarantee against self-incrimination even though in technical terms the violation may be of a command implied from a statute rather than the Constitution. In contrast, Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959), applied the harmless error principle where the judge failed to turn over statements as required by the Jencks Act, 18 U.S.C. § 3500, and the minority also declined to "go so far as those courts [of appeals] which have suggested that the harmless error doctrine can never apply as to statements producible under the statute." 360 U.S. at 375, 79 S.Ct. at 1236. However, the majority affirmed only on the basis that "it would deny reason to entertain the belief that defendant could have been prejudiced by not having had opportunity to inspect" a letter "when the very same information was possessed by defendant's counsel," 360 U.S. at 371, 79 S.Ct. at 1234, and the minority defined the standard of harmless error in such cases as "very strict," 360 U.S. at 376, 79 S.Ct. 1231; the disagreement seems not to have been as to the strictness of the standard but rather as to its application on the particular facts. See United States v. Annunziato, 293 F.2d 373, 381–382 (2 Cir.), cert. denied 82 S.Ct. 240 (1961), also relating to § 3500, and United States v. Raspovich, 241 F.2d 779 (2 Cir. 1957), relating to grand-jury minutes.

When the prosecutor's conduct is considered to have transgressed the basic principles of fair play embodied in the due process clause, as in the coerced confession cases, the standard is strict indeed. The Supreme Court, in Napue v. People of State of Illinois, 360 U.S. 264, 269–270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), quoted with approval Judge Fuld's statement in People v. Savvides, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854–855 (1956), that "a lie is a lie, no matter what its subject, and, if it is in any way relevant to the case," reversal must follow if the prosecutor, knowing of the lie, leaves it uncorrected. A recent Note contrasts what is thus believed to be the rule that the knowing use of perjured testimony requires reversal even though prejudice is not affirmatively shown, with "the area of passive nondisclosure of exculpatory evidence, in which prejudice is the central matter of inquiry and the evidence not disclosed is subjected to a critical examination to determine whether it is reasonably likely that a different result would have been reached had the exculpatory evidence been made available." The Duty of the Prosecutor to Disclose Exculpatory Evidence, 60 Colum.L.Rev. 858, 863 (1960). Mesarosh v. United States, 352 U.S. 1, 77 S.Ct.

1, 1 L.Ed.2d 1 (1956), indicates that when the prosecutor is ignorant of the perjury, some showing of materiality is required, although very little will do, 352 U.S. 1, 10–11, 77 S.Ct. 1 (1956).[2]

■ The conclusion we draw from all this is that the standard of how serious the probable effect of an act or omission at a criminal trial must be in order to obtain the reversal or, where other requirements are met, the vacating of a sentence, is in some degree a function of the gravity of the act or omission; the strictness of the application of the harmless error standard seems somewhat to vary, and its reciprocal, the required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play. At one end of the range is the case where the defendant has simply, although excusably, not had the benefit of evidence that has later become available to him; there the Berry test requires a showing that the new evidence "would probably produce a different verdict." At the other end of the range is the case of a defendant being obliged to plead to a capital charge without benefit of counsel; there the court "does not stop to inquire whether prejudice resulted." Hamilton v. State of Alabama, 82 S.Ct. 157, 159 (1961).[3] Between these extremes lie the other cases we have reviewed—newly discovered evidence that a witness has recanted, or had lied (without knowledge by the prosecutor); ordinary errors in the admission or exclusion of evidence; violations of statutory commands; and infringements of other constitutional guarantees.

The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that "The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach," People v. Savvides, supra, and by the teaching of experience that mere admonitions are insufficient to prevent repetition of abuse. See Mapp v. Ohio, 367 U.S. 643, 650–653, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In other cases, where the conduct of the trial has been less censurable, or not censurable at all, a greater showing of prejudice is demanded, because the interest in obtaining an ideal trial, with the trier of the facts considering all admissible evidence that has ever become available, and nothing else, is not thus supplemented and may be outweighed by the interest in avoiding a retrial unlikely to have a different outcome—an interest especially weighty when, as is normally true on collateral attack, the second trial will come long after the first.

■ On this view of the law, the only question now before us is whether, if the hearing were to show the worst conduct by the prosecutor consistent with such facts as are now known (although we do not suggest that it will), namely, a deliberate suppression of the Gessele letters, which, if proved, would constitute a denial of due process, the correspondence was plainly beyond any possibility of helpful use in petitioner's defense.

2. The case was before the Court on direct appeal and suggestion of the Government for remand, rather than on motion for a new trial; hence the Larrison rule was not technically applicable, although the Court seems to have reached a result similar to what that rule would have yielded.

3. As Mr. Justice Douglas there noted, it is normally not feasible in such cases to determine whether prejudice occurred. However, as we read Hamilton, the Court would not decide differently in the face of the most convincing evidence that under no circumstances could counsel have assisted; in such cases the violation of basic concepts is such that the requirement of a showing of prejudice drops to zero.

For the reasons previously indicated, we cannot go so far. If the evidence should show mere negligence in the Government's handling of the correspondence, a test of prejudice at least as rigorous as that in Consolidated Laundries should be applied; assuming, as we tentatively do, that relief under § 2255 would be available in such a case, the Larrison formula may be serviceable. If the hearing should lead to a finding of such negligence plus deliberate misstatements to the court and the petitioner, petitioner's burden would be less than in the case of negligence alone but more than in a case of deliberate suppression.

The order denying the motion is reversed, with directions to conduct a hearing with respect to the allegedly missing letters and then to take action consistent with this opinion.