**UNITED STATES of America,**

v.

**Alphonso MOSCA et al., Defendants.**

**No. 71 CR 304.**

United States District Court,
E. D. New York.

June 5, 1972.

Liam S. Coonan, Sp. Atty., Dept. of Justice (Robert A. Morse, U. S. Atty., Denis E. Dillon, Brooklyn, N. Y., Atty. in Charge, of counsel) for the Government.

Marshall G. Kaplan, Brooklyn, N. Y., for defendant Emmons.

H. Elliot Wales, New York City, for defendants Mosca.

Michael J. Gillen, Brooklyn, N. Y., for defendant Wolfson.

· Allen Lashley, Brooklyn, N. Y., for defendant Zavod.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Defendants were indicted on March 24, 1971, in three counts. The first count charged them with conspiring to commit mail and wire frauds and to harbor a person wanted on a Federal warrant issued upon a charge of parole violation. Broadly, the charge of the indictment was that the defendants had formed a scheme to defraud those seeking and those granting mortgage loans by forming a straw company having no real assets which would for a fee issue commitment or "take-out" letters by which it bound itself to purchase construction loan mortgages made by lending institutions. Such commitment letters were meant to enable prospective borrowers to obtain mortgage financing for construction projects which the lending institutions would not otherwise finance because of their unwillingness to make long term real estate mortgage loans. The fraud consisted in defrauding prospective borrowers of the fees they paid for the worthless commitment letters and defrauding the lending institutions by inducing them to lend in reliance on the worthless commitment letters. The conspiracy count contained the allegations descriptive of the scheme, Count 2 specifically charged the commission of the wire fraud, and Count 3 specifically charged the harboring offense.

A central figure in the alleged conspiracy was one Edward Wuensche. Wuensche was not named as a defendant; he was charged as a co-conspirator, and he was the Government's principal and indispensable witness. Wuensche was the person allegedly harbored by the defendants. It was charged that the defendants had furnished Wuensche with false identification papers so that he could under the name of Williams act as an officer of the straw company formed to issue the commitment letters without risk of arrest. A parole violation warrant had been issued for Wuensche's arrest in July of 1968. The period covered by the indictment is September 1, 1968, to August 31, 1969.

All of the defendants were convicted on Counts 1 and 2 and all were acquitted on Count 3, the harboring charge.

Defendants have moved to set aside the adverse verdicts and for a new trial on the ground that the Government failed, after request, to make available to them one Catherine Wuensche, a potential witness whose whereabouts were known to the Government but not to the defendants, and who at the times in question was living with the witness Edward Wuensche, had been married to him, and was, apparently, living with Wuensche at Government expense and under Government protection.

At the trial, during the cross-examination of the witness Edward Wuensche, counsel for the defendant Emmons demanded that the Government produce Catherine Wuensche or disclose her whereabouts so that she could be subpoenaed. Government counsel, insisting on an *in camera* statement, advised the Court out of defendants' hearing that Mrs. Wuensche was a British National and outside the United States and could not be compelled to attend. (Tr. 429A) The reason assigned for making an *in camera* statement was to secure the safety of the witness Wuensche and that of his wife. At a later stage in the trial there was an indication by counsel that some stipulation could or might be made to cover certain testimony that Mrs. Wuensche might have been expected to give. However, that program failed when the testimony of the Government witness Gold, in the stated opinion of defense counsel, indicated that Mrs. Wuensche might have specific knowledge which would enable her to be a witness to facts in the case.

After the evidence closed counsel for defendant Emmons requested a charge that the jury may infer from the withholding of a witness within a party's control that the testimony would be unfavorable to the party failing to call the witness (Tr. 1442). Reference was

made to the witness Wuensche's testimony that he was living in protective custody at Governmental expense and that Mrs. Wuensche, as she had become, was living with him (Tr. 414–416). It was argued that presumptively Mrs. Wuensche was as available as was her husband (Tr. 1454). Government counsel, still apparently unwilling or conceiving himself unable to disclose more, indicated that it was simply the fact that Mrs. Wuensche was unavailable as a witness. After further discussion the charge dealing with governmental failure to call a witness was presented to counsel and discussed substantially in the form in which it was later charged (Tr. 1783–1784) and defense counsel were asked whether they were waiving the whole question of the availability of Mrs. Wuensche if the charge was given (Tr. 1473). Counsel promptly declined to waive. It was pointed out then that defendants were certainly entitled to the charge on the failure of the Government to produce the witness in the absence of a concrete showing that the witness was unavailable to the Government for production (Tr. 1484). It was suggested that a telephonic interview between the witness and defense counsel might be arranged by the Government to enable the defense to determine whether they wished to call Mrs. Wuensche as a witness, the Government having indicated that it was persuaded that it could neither compel her appearance nor bring about her voluntary appearance (Tr. 1488–1489). Counsel for defendant Emmons insisted that he wanted the uncalled witness charge, saying that there certainly must be power to coerce the witness's appearance, and, if not, that her whereabouts should be disclosed so that the defense could see to managing her appearance (Tr. 1489–1490). After consultation the Government offered to provide a telephonic link for any or all of the defendants to speak to Mrs. Wuensche or to forward any communications to her that counsel wished under appropriate safeguard of their secrecy; Government counsel declined, however,

to disclose her address, stating that Mrs. Wuensche had asserted to members of the Government that her life had been threatened by one of the defendants and that as a consequence she had no intention of placing herself anywhere near him (Tr. 1493–1494). Counsel for defendant Emmons then suggested that the charge be given as requested, pointing out that the responsibility of the defense was to present live testimony and not a substitute for it, and that Government counsel had really said nothing except that they would not produce the witness and could not do so (Tr. 1494–1945). The Government offered to join defense counsel in recording a telephone interview with Mrs. Wuensche and reading it to the jury, or in having her testimony 'phoned to the jury, in effect, by having her examined by telephone, or presented to the jury through a tape recording of an examination conducted by telephone, which then could be played to the jury. Counsel for defendant Emmons rejected the suggestion arguing that it failed to accord Sixth Amendment rights (Tr. 1496). When the Government again urged the absence of any security measures for the witness, it was argued in answer that the Government ought to be able to secure her during her testimonial period at least (Tr. 1506–1507).

Government counsel finally indicated to the defense that his information was that Mrs. Wuensche was not a United States national (Tr. 1507). Further discussion disclosed that the witness was neither a United States national nor within the continental United States, but beyond the process of the Court. At length counsel for the defendant Emmons explicitly and unequivocally applied for a subpoena to compel the attendance of Mrs. Wuensche as a witness (Tr. 1517–1520).

On the next court day it was reported that an effort had been made to serve a subpoena on Mrs. Wuensche with a tender to her of sufficient funds to cover her transportation to the court house, she had declined to accept the service

and refused to abide by the command of the subpoena (Tr. 1556–1559). When the defense argued that there was no explanation for having the witness beyond reach of subpoena, Government counsel insisted that the extraterritorial location of the witness Wuensche and of Mrs. Wuensche reflected a decision of the McClellan Committee (Tr. 1565–1566). When counsel pointed out that there was no evidence and no public record of that fact (Tr. 1573–1574), the Court stated that if the defendants wanted a full dress investigation that it would request the Government to delay the trial and afford defendants an opportunity to take Mrs. Wuensche's deposition at some place other than her then place of refuge on the issue or her willingness to appear as a witness, the reason why she was where she was and what her apprehensions were (Tr. 1575). At that point counsel for defendant Emmons asserted that he was ready to sum up saying, "I was willing to concur in your suggestion originally about deferring the hearing and everything if it became necessary." Counsel indicated that he intended in summation simply to say that Mrs. Wuensche had not appeared to support her husband's testimony (Tr. 1577). All that was said was said by counsel for defendant Emmons in his summation (Tr. 1674);

> "And, incidentally, you may have noticed that even though Wuensche testified without contradiction a couple of times that he was living with his wife and that apparently his wife didn't think enough of the story to come here and support it in any respect."

After verdict, as had been indicated earlier, the parties were invited to make any appropriate motion to determine the facts with respect to Mrs. Wuensche's availability as a witness, the explanation of her unavailability, if it existed, and, finally, whether she was testimonially qualified as a witness in the case and if so what the contents of her testimony would have been.

Accordingly under an order made after verdict and before judgment of conviction the testimony of Mrs. Wuensche was taken in London, England, by counsel for the Government and counsel for the defendant Emmons acting for himself, and the defendants Wolfson and Zavod. The testimony was taken on March 9, 1972, and filed in Court on April 6, 1972.

It appears from Mrs. Wuensche's testimony, accepting it as true in these respects, that she was a native of England (Tr. 2) and that she had never become a citizen of the United States by naturalization or otherwise and was travelling under a British passport as was her daughter (Tr. 81–84). She in substance confirmed that she had been subpoenaed to return and testify in the trial during November 1971 but had refused to do so, and had insisted that there was no one who had any power to make her return (Tr. 85–87).

She testified further that, having earlier been in Florida she, Mr. Wuensche and her daughter went from Florida to Washington during the period when Mr. Wuensche was testifying before the sub-committee of the Senate. During that period they were told that they were in protective custody and the marshals advised them that they were not to discuss anything with anyone and to remain in their rooms. After Mr. Wuensche had testified before the sub-committee they were told they could leave the United States and did leave from Washington. Mr. Wuensche bought the tickets in Mrs. Wuensche's presence at the airport in Washington. The marshals were present when the tickets were purchased and the marshals drove Mr. and Mrs. Wuensche and the latter's daughter, in a government vehicle to the airport and assisted them throughout the process of boarding the airplane (Tr. 88–90). Mrs. Wuensche, with her husband and daughter, left the United States about October 1, 1971, and she was living with Mr. Wuensche in November 1971, the month of the trial in the present case (Tr. 83–84).

Mrs. Wuensche's testimony was that she had first met Mr. Wuensche in Texas in 1967 and had joined him in Philadelphia in 1967 where, as she understood it, he was working on a "mutual fund" affair. In 1968 she went with him to Florida, where he had become interested in the State Fire & Casualty Company, and she worked in the capacity of a clerk and receptionist for the company at $125 a week. While they were in Florida she recalls that he was arrested. The record elsewhere indicates that that was an arrest on July 15, 1968, on a bad check charge related to a $700 check, and that he was released on a bond of $1,000. Apparently after that date they went to Montreal, Canada, approximately in July or early August for a period of 2 or 3 weeks and Mrs. Wuensche was thereafter in Maine to arrange matters apparently related to her daughter and her former marriage. Thereafter, and perhaps after returning first to Canada, Mrs. Wuensche was with defendant Wuensche for some two months in Delaware. While the chronology is uncertain in her testimony it is probable that her testimony indicates, if accepted, that before going to Delaware they had been at a Manhasset motel and at a place in Toms River in New Jersey. According to her testimony they removed from Delaware to Tennessee some time around February of 1969.

After the arrest of Mr. Wuensche in February 1969 on the warrant based on the charge of parole violation, Mrs. Wuensche went to Las Vegas and stayed with her sister, apparently until the release of Wuensche from custody. She then rejoined Wuensche and they were married—in September 1969. Apparently after Mrs. Wuensche returned from Las Vegas she and Mr. Wuensche spent a period in Indiana.

Mrs. Wuensche testified that she was present and in a position to observe a number of meetings with all of the named defendants and with Mr. Gold. In general, Mrs. Wuensche's testimony was that while she was present on a number of occasions when there were meetings between Wuensche and one or another or groups of the defendants, she did not usually participate in or overhear the content of their meetings. Her testimony would therefore have corroborated or extended other testimony about meetings that had taken place, supplied dates (usually very approximate) or would have contradicted assertions that meetings had taken place. Her testimony as transcribed does not directly contradict any other evidence in the case. Her testimony would have been to the effect that the defendants knew that Wuensche had been charged with a violation of parole, and that they were orienting their actions so as to make him useful to them notwithstanding that he was a parole violator and that the FBI were affirmatively looking for him. Her testimony is full however, of assertions that Wuensche was very much in the right on the question of parole violation, and that he was being persecuted by a parole officer who was either exaggerating charges that Wuensche was travelling without permission of his parole officer or was making much of trifling parole violations.

Mrs. Wuensche's testimony does indicate some degree of knowledge of what was going on (compare Tr. 70–77 with Tr. 91–98). Mrs. Wuensche testified that she had been interviewed both by members of the staff of the Senate subcommittee before which Wuensche testified, and by the Special Attorney, Joseph F. Lynch, who was in charge of the present case until shortly before the trial. She testified that counsel to the sub-committee talked to her but made no notes of what she said. She testified that when she spoke to Mr. Lynch, during a two hour long interview between Mr. Lynch and her husband at which she was present, he did make notes of some of the things which she said (Tr. 51, 66, 69–70, 71–77, 123). Government counsel represented that there were nowhere in the Government's file any reports of interview with Mrs. Wuensche by any member of the FBI or by Mr. Lynch.

Mrs. Wuensche testified that she had received threats while she was in Las Vegas in April 1969. The threats were communicated by Gold (charged as a co-conspirator and a Government witness) on behalf of defendants Wolfson and Emmons (Tr. 119): She testified that she had earlier heard Wolfson and Emmons boasting about how they could take care of people or "work somebody over" (Tr. 119, 120), and that, when she got back from Las Vegas, she heard defendant Zavod brag that they had shot somebody five times and put a hatchet through his head and he had still lived and testified (Tr. 120). She testified that she communicated these threats to Mr. Lynch, explaining that the threats were to endanger her life and "work her over" if she did not give Emmons and Wolfson "the name of this particular man"; she says that she told Mr. Lynch that she didn't know whom they were talking about (Tr. 66–67). She said she communicated the fact of the threat also to the FBI in Las Vegas and a man named McClusky (or a similar name) interviewed her in Las Vegas. She testified that she told Mr. Lynch that she was frightened and wanted to leave the United States (Tr. 73–74). Mr. Lynch, as she testified at one place (Tr. 123), told her that she and Mr. Wuensche could not leave, that they "absolutely could not leave there." She testified further that after she separated from her first husband, she was trying to get money together and at that time wanted to go to England. She says that Wuensche then told her that he would not be able to leave the United States for quite a time (Tr. 124). Mrs. Wuensche's attitude was that she had left the United States at the first opportunity that she had (Tr.124).

Government counsel state that at no time did the Government visualize using Mrs. Wuensche as a Government witness. There is no indication that the Government intentionally cooperated in Mrs. Wuensche's leaving the United States without notice to defense counsel in order to deprive defense counsel of a witness. It does not appear that counsel for the Senate sub-committee intended to use Mrs. Wuensche as a witness before the sub-committee.

There is no evidence on the question of who is responsible for Mrs. Wuensche's leaving the United States except her own testimony that it was her preference and her wish coupled with the statement of Government counsel that the decision to provide asylum for the witness Wuensche (and presumably his wife) at the place where they were was a decision of the Congressional Sub-committee (Tr. 1565–1566). There is no doubt that the witnesses' departure was facilitated by the Government and that it did occur after the trial date in the present case had been set and without any notice to the defendants.

By the severe test of United States v. Mendez-Rodriguez, 9th Cir. 1971, 450 F. 2d 1, it can be argued that the Government is responsible for removing a person who was a potential witness from the reach of the process of the Court without according the defendants any opportunity to interview the witness and either to take her testimony under Rule 15 so that it could be used under Rule 15(e) or to take proceedings under 18 U.S.C. § 3149 for the detention of the witness until released pursuant to the provisions of Section 3146, including the provisions of Section 3150. The essential weakness of the argument is that the potential usefulness of Mrs. Wuensche as a witness was necessarily obvious to each of the defendants. It was an easy inference that Wuensche would be a witness against the defendants at the trial, but there is no indication that any defendant sought an opportunity to interview Mrs. Wuensche or tried to locate her, and then found that she was in Governmentally protected hiding. Compare United States v. Mayersohn, 2d Cir. 1971, 452 F.2d 521.

Mrs. Wuensche was testimonially qualified to give evidence on the occurrence of meetings among the defendants and testimony on a range of collateral matters. If her testimony is accepted at

face value, she could not have given direct testimony on the issues relating to the details of the operation of the straw company that was to issue the commitment letters, or concerning the validity of its business transactions, since her testimony, broadly, is that she did not hear the conversations relating to the transactions involved. She did indicate that she could have given testimony relating to the harboring charge and the extent to which Wuensche's parole status was known to the other defendants.

The apparent content of Mrs. Wuensche's testimony is such as to indicate that she would have been, if anything, a Government witness, and that the defendants could not, without risk of furnishing substantial confirmation of the meetings alleged by the Government, have called her as a witness. The suggestion that her testimony would have been exculpatory because she apparently would have been prepared to give competent testimony that the Acceptance Corporation was a mutual fund—which it manifestly was not—and that the transactions were not guilty transactions, has no support in the transcript of her evidence. The references to mutual funds show the limited extent of her knowledge and interest, if taken as truthful, and the inference that she believed that the transactions were innocent indicates only that she was so informed. She evidently had no such information as would enable her to testify affirmatively to matter which she was competent to testify about and which might have impressed the jury that the transactions were innocent.

So far as the violation of parole and the parole warrant evidence is concerned, it would not have been helpful to the defendants but would on the contrary have indicated that they were all aware of the parole problem, that it was a subject of discussion, and, as she agreed it could have been put at one point, that it was known that Wuensche was on the run from the FBI. If any general inference is to be drawn from the entire transcript of the testimony of Mrs. Wuensche it would be that if either side had been disposed to call her as a witness it would have been the Government and that the probability that, after interview, the defendants would have decided not to call her as a witness is all but overwhelming.

While the entire episode was unfortunate in the extreme and does indicate a recklessness of procedure on the Government's part which is to be emphatically deplored, it cannot be said that any substantial interest of any defendant was sacrificed or prejudiced by what occurred. Nevertheless, *Mendez-Rodriguez, supra,* can easily be read as making inquiry into the content of testimony irrelevant once it is determined that the witness is testimonially qualified, and it could also be read as requiring that such a course as the Government pursued here should result in a dismissal, since it denied the defense an opportunity to interview a possible witness whom the Government had interviewed, and denied them an opportunity to take her deposition in the defendant's presence or to seek to secure her detention. But *Mendez-Rodriguez* enunciates a rule of striking severity that may have an explanation in local conditions. For a District Court to adopt it in a more doubtful case would not be appropriate, despite some recent disturbing signs in this locale. That, however, must not encourage the Government to pursue comparable procedures in the future. Compare United States v. Singleton, 2d Cir. 1972, 460 F.2d 1148 at 1152.

It is, accordingly

Ordered that the motions of the defendants to set aside the verdict and for a new trial are in all respects denied.