**UNITED STATES of America,
Appellee,**

v.

**Alphonso MOSCA, Sr., et al., Appellants.**

**Nos. 354, 355, Dockets 72–1750, 72–1764.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1972.

Decided March 5, 1973.

Certiorari Denied June 18, 1973.
See 93 S.Ct. 3003, 3019.

H. Elliot Wales, New York City (Gretchen White Oberman, New York City, on the brief), for appellants Al-

phonso Mosca, Sr., and Alphonso Mosca, Jr.

Henry Mark Holzer, Brooklyn, N. Y., for appellant Wolfson.

Allen Lashley, Brooklyn, N. Y., for appellant Zavod.

Marshall G. Kaplan, Brooklyn, N. Y., for appellant Emmons.

Sidney M. Glazer, Atty., Dept. of Justice, Washington, D. C. (Robert A. Morse, U. S. Atty., Brooklyn, N. Y., Denis E. Dillon, Liam S. Coonan and Shirley Baccus-Lobel, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before FRIENDLY, Chief Judge, and MANSFIELD and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Alphonso Mosca, Sr., Alphonso Mosca, Jr., Nathan Wolfson, Joseph Zavod and William Emmons appeal from judgments of conviction entered upon jury verdicts returned November 16, 1971 after an eleven day trial before John F. Dooling, *District Judge*, in the Eastern District of New York, finding each appellant guilty on one count of wire fraud, in violation of 18 U.S.C. § 1343 (1970), and on one count of conspiring to commit mail and wire fraud and of conspiring to harbor a fugitive, in violation of 18 U.S.C. § 371 (1970).[1]

1. The indictment, returned March 24, 1971, also charged defendants Harry Riccobene and John Scially, as well as the five appellants, with wire fraud (Count Two). The conspiracy count (Count One), in addition to charging the seven defendants referred to in Count Two, also named Edward Wuensche, Joseph Gold and Bernard Solomon as co-conspirators, but not as codefendants, in conspiring to commit mail and wire fraud and in conspiring to harbor a fugitive.

On the first day of the trial, Riccobene's case was severed; but we have not been informed as to what became of his case thereafter. Also on the first day of the trial, Scially pleaded guilty to the conspiracy count; he testified as a government witness; and on March 3, 1972 he was sentenced to a five year term of pro-

bation on Count One, the other two counts being dismissed on motion of the government.

The indictment also charged the five appellants, as well as Riccobene and Scially, in Count Three, with harboring a fugitive (Edward Wuensche), in violation of 18 U.S.C. § 1071 (1970). The jury acquitted all appellants on this count.

On June 16, 1972, Judge Dooling sentenced the five appellants to concurrent terms of imprisonment on Counts One and Two as follows: Mosca, Jr., one year and a day; Emmons and Wolfson, two years under 18 U.S.C. § 4208(a)(2) (1970); and Zavod and Mosca, Sr., two years under 18 U.S.C. § 4208(a)(1) (1970), each to become eligible for parole after four months imprisonment.

The chief issue raised on appeal by all appellants is whether the trial judge erred in denying their motions to set aside the verdicts and for new trials on the ground that the government failed upon request to make available to appellants a potential witness whose whereabouts was known to the government but not to appellants. Other subordinate claims of error are raised by several of the appellants.

We affirm.

## I.

In view of the issues raised on appeal, a summary description of the fraudulent scheme and conduct for which appellants were convicted will suffice. Essentially the evidence established that defendants organized and used a straw corporation with a grossly misleading statement of assets (this corporation being funded by worthless debentures of another straw corporation) to purchase construction loan mortgages by the issuance of commitment letters. Such commitment letters were in the nature of guaranties; they commanded sizeable fees; but they were in fact worthless because of the absence of any assets in the issuing corporation.

Judge Dooling succinctly described the fraud charged as follows:[2]

"Broadly, the charge of the indictment was that the defendants had formed a scheme to defraud those seeking and those granting mortgage loans by forming a straw company having no real assets which would for a fee issue commitment or 'take-out' letters by which it bound itself to purchase construction loan mortgages made by lending institutions. Such commitment letters were meant to enable prospective borrowers to obtain mortgage financing for construction projects which the lending institutions would not otherwise finance because of their unwillingness to make long term real estate mortgage loans. The fraud consisted in defrauding prospective borrowers of the fees they paid for the worthless commitment letters and defrauding the lending institutions by inducing them to lend in reliance on the worthless commitment letters."

There was a great deal of evidence adduced at the two week trial in support of the foregoing charges. The evidence of course must be viewed in the light most favorable to the government at this stage of the case. United States v. D'Avanzo, 443 F.2d 1224, 1225 (2 Cir.), cert. denied, 404 U.S. 850 (1971). With the exception of appellant Wolfson, none of the appellants challenges the sufficiency of the evidence.

## II.

What each of the appellants does challenge, however, is the trial judge's denial of their motions to set aside the verdicts and for new trials. Such motions were based on the claim that the government had sequestered a potential witness whose whereabouts was known to the government but not to appellants. A statement of the facts and proceedings in the trial court involving this claim is necessary to an understanding of our ruling thereon.[3]

The witness in question was Mrs. Edward Wuensche. She was the wife of Edward Wuensche, a named co-conspirator but not a defendant. He was the government's principal witness at the trial. It was he whom defendants were charged with having harbored as a fugitive. They allegedly furnished him with false identification papers so that, under a fictitious name, he could act as an officer of the straw corporation formed to issue commitment letters.

---

2. Judge Dooling's opinion of June 5, 1972 denying appellants' motions to set aside the verdicts and for new trials. 355 F.Supp. 267, 268 (E.D.N.Y.1972).

3. We shall assume familiarity with Judge Dooling's detailed findings of fact on this issue which are set forth in his opinion of June 5, 1972. *Supra* note 2, 355 F. Supp. at 268–72.

The question of the whereabouts of Mrs. Wuensche was first raised during cross-examination of Edward Wuensche by counsel for defendant Emmons.[4] He demanded that the government either produce Mrs. Wuensche or disclose her whereabouts so she could be subpoenaed. Government counsel informed the court that she was a British national, that she was not within the continental United States and that she was beyond the process of the court.

While there was much backing and filling during the balance of the trial on the demand for production of Mrs. Wuensche and numerous proposals were made to provide her testimony or its equivalent in some form, the primary purpose of defense counsel at the time of trial was to lay a basis for requesting the court to charge that the jury might infer from the withholding of a witness within a party's control that the testimony of such witness would be unfavorable to the party failing to call the witness. As counsel for defendant Emmons candidly stated, "Judge, all I want is this Charge." The court eventually charged the jury on this issue substantially as requested by defense counsel.[5]

Going back for a moment to the point in the trial when the evidence had been concluded,[6] on Thursday, November 11, 1971, the court excused the jury until the following Monday, November 15, but recessed the trial to the following day, November 12, at which time counsel and defendants were present. After an extended colloquy on November 12 between counsel and the court on the unavailability of Mrs. Wuensche as a witness, there finally emerged from counsel for defendant Emmons an unequivocal application for issuance of a subpoena to compel her attendance as a witness. The court immediately granted the application. It ordered that a subpoena made returnable the following Monday, November 15, be served on Mrs. Wuensche, and that she be tendered sufficient government funds to provide for her transportation to the courthouse.

On the next court day, November 15, government counsel informed the court that over the weekend efforts had been made by a United States Marshal to serve the subpoena on Mrs. Wuensche and that she had been tendered transportation expenses. She refused to accept service of the subpoena and refused to come to the trial. Government counsel further reported that his efforts to speak with Mrs. Wuensche by telephone had been met with a refusal on her part to come to the phone. And finally government counsel reported that his efforts to have Mr. Wuensche persuade Mrs. Wuensche to appear at the trial likewise had failed to produce the witness.

Despite such efforts, defense counsel continued to press for an explanation as to why the witness was beyond the subpoena reach of the court. Government counsel stated that the present location of Mrs. Wuensche reflected a decision of the McClellan Subcommittee of the Senate Judiciary Committee, before which

4. It was trial counsel for defendant Emmons who pressed the issue at trial as to the whereabouts of Mrs. Wuensche; and it was he who, together with government counsel, took her deposition in England, referred to below. Nevertheless, counsel for all appellants now avail themselves of the claim that the government improperly sequestered her. And we treat the claim as one raised by all appellants.

5. The court charged the jury on this issue as follows:
"The unexplained failure of Government to call a witness who was indicated by the evidence to be in a position to give material and relevant testimony that would not be merely cumulative of other testimony, warrants you in inferring that the testimony of such witness, if called, would not be favorable to the Government, as a party having the burden of proof on the issues, on which that witness could testify, provided you are satisfied from the evidence that the witness is available to be called, and if called, would testify."

6. None of the defendants had testified and no witnesses had been called to testify on their behalf.

Mr. Wuensche had appeared as a witness at an earlier date. When defense counsel pointed out that there was no evidence of that in the record, Judge Dooling stated that "if the defendants wanted a full dress investigation [the Court] would request the Government to delay the trial and afford defendants an opportunity to take Mrs. Wuensche's deposition at some place other than her then place of refuge on the issue of her willingness to appear as a witness, the reason why she was where she was and what her apprehensions were." [7]

Counsel for defendant Emmons immediately responded, "Well, I am ready to sum up, Judge." He indicated that in summation he intended simply to tell the jury that "Mrs. Wuensche had not appeared to support her husband's testimony." He did.[8] Following summations by all counsel, Judge Dooling charged the jury, including the instruction requested by the defense on the government's failure to call Mrs. Wuensche as a witness.[9] This concluded the November 15 trial proceedings.

On the following day, November 16, the jury returned its verdict convicting appellants on Counts One and Two and acquitting them on Count Three. After the jury had been discharged, Judge Dooling invited counsel to file any appropriate motion to determine (a) the facts with respect to Mrs. Wuensche's availability as a witness; (b) the explanation of her unavailability if it existed; (c) whether she was testimonially qualified as a witness in the case; and (d) if so, what the contents of her testimony would have been.[10] Upon the filing of such a motion by appellants

Emmons, Wolfson and Zavod,[11] Judge Dooling entered an order on February 7, 1972 authorizing counsel for Emmons (representing Wolfson and Zavod as well) to attend the taking of Mrs. Wuensche's deposition in London, England, and to be reimbursed by the government for his expenses in doing so. Pursuant to a commission issued to counsel for Emmons, the deposition of Mrs. Wuensche was taken at the American Embassy in London on March 9 before an American Vice-Consul. The witness was examined on direct by counsel for Emmons, on cross by government counsel. The deposition, after being transcribed, was signed and sworn to by Mrs. Wuensche on March 16. It was filed in the district court on April 6. The complete deposition, consisting of 139 pages, is included in the Supplemental Appendix For Appellee on the instant appeal.

### III.

The deposition of Mrs. Wuensche, to the extent it is relevant to the essential issue raised on this appeal, may be briefly summarized.[12]

Mrs. Wuensche was in England with her seventeen year old daughter at the time she was subpoenaed to testify at the trial of the instant case in November 1971. She had been born in England and had never become a United States citizen by naturalization or otherwise. While in the United States, both she and her daughter travelled on British passports.

Mrs. Wuensche had left the United States about October 1, 1971 (one month before the trial below began), accompa-

---

7. *Supra* note 2, 355 F.Supp. at 270.

8. In summation, counsel for defendant Emmons stated:

"And, incidentally, you may have noticed that even though Wuensche testified without contradiction a couple of times that he was living with his wife and that apparently his wife didn't think enough of the story to come here and support it in any respect."

9. *Supra* note 5.

10. *Supra* note 2, 355 F.Supp. at 270.

11. Appellants Mosca, Sr. and Mosca, Jr. specifically disassociated themselves from this motion.

12. As Judge Dooling did, we accept as true Mrs. Wuensche's deposition testimony for purposes of determining the issue raised on appeal. Counsel for appellants and for the government were present and participated in the examination of the witness.

nied by her daughter and husband.[13] They departed the United States from Washington, D. C., where they had been while Mr. Wuensche was testifying before the McClellan subcommittee. During this period they were in the protective custody of United States marshals who told them to remain in their rooms and not to talk to anyone. Upon the completion of Mr. Wuensche's testimony before the subcommittee, they were told (presumably by the subcommittee staff) that they could leave the United States. Mr. Wuensche bought their airplane tickets at the Washington airport in the presence of Mrs. Wuensche and the marshals. The marshals drove Mr. and Mrs. Wuensche and the latter's daughter to the airport in a government vehicle. The marshals assisted them in boarding the plane which took them to England.

Mrs. Wuensche testified that she had left the United States at the first opportunity because of certain threats that had been made upon her life. Such threats were communicated to her by Joseph Gold (a co-conspirator and a government witness at the trial) on behalf of defendants Wolfson and Emmons. The gist of the threats was that appellants Wolfson and Emmons would "work over" Mrs. Wuensche if she would not give them the name of a certain individual in Tennessee. She continually asserted that she did not know any such person; but she became frightened because in the past she had heard the alleged co-conspirators speak of others they had "worked over", including one man who was said to have been shot five times and who ended up with a hatchet through his head. She testified that as a result of these threats she refused to return to the United States, even when she was served in November 1971 with a subpoena to appear at the trial of this case (in which her husband had already testified).

With respect to the business transactions that led to the instant indictment, Mrs. Wuensche admitted having been at the scene of many meetings concerning the company in question, but denied having any substantive knowledge or understanding of its structure or workings. She testified to the presence at some or all of these meetings of each of the alleged co-conspirators. The dates, places, and participants which she mentioned in connection with these meetings generally conformed to the trial testimony given earlier by her husband. She further testified that appellants unquestionably were aware of the fact that Mr. Wuensche had been sought by the FBI for alleged parole violations, and implied that the various changes in name and situs resorted to by the Wuensches during this period were within the knowledge, and perhaps at the direction, of the alleged co-conspirators.

Regarding the government's involvement in her departure from the United States, Mrs. Wuensche consistently maintained that the decision to depart was her own and was due to the apprehension caused by the threats she had received. She also testified that at various times prior to her departure she had been interviewed by counsel for the McClellan subcommittee, by the FBI, and by members of the staff of the United States Attorney's office.[14] As indicated above, her actual departure was facilitated by the United States marshals.

## IV.

It seems clear from the foregoing summary of Mrs. Wuensche's deposition, as well as the context in which it was taken, that appellants failed to demon-

---

13. Mrs. Wuensche had been in the United States continuously since 1967 (except for brief periods in Canada). She had been living with Mr. Wuensche for most of the time since then, both before and after their marriage in September 1969, including the time period relevant in this case. Mrs. Wuensche was in protective custody in the United States from March 1971 until she left this Country in October.

14. No memoranda or records of such alleged interviews by the FBI and by Mr. Lynch, an Assistant United States Attorney for the Eastern District of New York, were in the government files.

strate any prejudice resulting from their inability to call Mrs. Wuensche as a witness at trial. Her deposition indicated that, if called, she would have simply corroborated in certain respects the testimony of her husband, the government's chief witness. None of Mr. Wuensche's testimony was in any way contradicted by Mrs. Wuensche. Indeed, the one likely effect of in-court testimony by Mrs. Wuensche would have been to establish appellants' knowledge of Mr. Wuensche's parole violation, thereby damaging appellants on the fugitive harboring count upon which they were acquitted. The principal question before us, therefore, is whether the government's involvement in making Mrs. Wuensche unavailable as a trial witness requires reversal despite the absence of any showing of prejudice to appellants. We hold that it does not.

Under Fed.R.Crim.P. 52(a), an error at trial shall be disregarded on appeal if it "does not affect substantial rights"; and see 28 U.S.C. § 2111 (1970).[15] In Kotteakos v. United States, 328 U.S. 750, 764–65 (1946), the test for determining whether that standard had been met was said to be, "[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress." That test was refined by our Court in Kyle v. United States, 297 F.2d 507 (2 Cir. 1961),

where the government allegedly had suppressed or lost certain letters which the defendant claimed had come into the government's possession prior to the trial. In ordering that a hearing be held on that claim, we first noted the defendant's weak showing of prejudice and materiality, but concluded that that fact, in and of itself, was not necessarily dispositive:

"[T]he standard of how serious the probable effect of an act or omission at a criminal trial must be in order to obtain the reversal or, where other requirements are met, the vacating of a sentence, is in some degree a function of the gravity of the act or omission; the strictness of the application of the harmless error standard seems somewhat to vary, and its reciprocal, the required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play.

\* \* \*

The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that 'The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach,' People v. Savvides [1 N.Y.2d 554, 557,

15. Historically, both the rule and the statute have been taken to apply only to errors by the trial judge. In United States v. Ravich, 421 F.2d 1196, 1201–02 (2 Cir.), cert. denied, 400 U.S. 834 (1970), however, we found "no good reason for holding police officers to a standard of perfection while excusing errors by judges that do not affect substantial rights." We shall therefore assume here, as we often have done, e. g., Kyle v. United States, 297 F.2d 507, 512–14 (2 Cir. 1961), that errors by the prosecution may similarly be treated under the harmless error doctrine.

We also recognize that inherent in appellants' claim is the alleged denial of the

Sixth Amendment right to compulsory process. The limited applicability of the harmless error rule to constitutional claims was first noted by the Supreme Court in Chapman v. California, 386 U.S. 18, 21–24 (1967), and has since been reinforced in such cases as Harrington v. California, 395 U.S. 250, 254 (1969), and United States v. Schor, 418 F.2d 26, 30 (2 Cir. 1969). We hold under the circumstances of this case that denial of appellants' right to compulsory process, if error at all, was harmless beyond a reasonable doubt. Chapman v. California, supra, 386 U.S. at 42–45.

154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854–55 (1956)] and by the teachings of experience that mere admonitions are insufficient to prevent repetition of abuse. See Mapp v. Ohio, 367 U.S. 643, 650–653, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In other cases, where the conduct of the trial has been less censurable, or not censurable at all, a greater showing of prejudice is demanded, because the interest in obtaining an ideal trial, with the trier of the facts considering all admissible evidence that has ever become available, and nothing else, is not thus supplemented and may be outweighed by the interest in avoiding a retrial unlikely to have a different outcome—an interest especially weighty when, as is normally true on collateral attack, the second trial will come long after the first." 297 F.2d at 514.

This two-dimensional approach, in which the requisite showing of prejudice will vary inversely to the gravity of the misconduct, has been repeatedly applied by our Court. E. g., United States v. Mayersohn, 452 F.2d 521, 525–26 (2 Cir. 1971); United States v. Keogh, 391 F.2d 138, 146–48 (2 Cir. 1968); cf. United States v. Mele, 462 F.2d 918, 924 (2 Cir. 1972). As we summarized the rule in United States v. Mayersohn, *supra*, 452 F.2d at 526, "the more egregious the suppression, the less material to the verdict need be the evidence suppressed to justify a new trial. Where the suppression is deliberate, the interest in enforcing the second principle becomes paramount. Where the suppression is inadvertent, the principles reach equipoise and a careful analysis of the extent to which the evidence suppressed harmed the defendant is required." (footnotes omitted).

Here, there can be no doubt that the government's conduct reflects indiscretion and a lack of candor which the district court appropriately denounced as "unfortunate in the extreme and [indicative of] a recklessness of procedure on the Government's part which is to be emphatically deplored." 355 F.Supp. at 273.[16] We further agree with the district court, however, that "it cannot be said that any substantial interest of any defendant was sacrificed or prejudiced by what occurred." 355 F.Supp. at 273. What saves this case from reversal is our agreement, based on our independent examination of the record, with the district court's finding that "[i]f any general inference is to be drawn from the entire transcript of the testimony of Mrs. Wuensche it would be that if either side had been disposed to call her as a witness it would have been the Government and that the probability that, after interview, the defendants would have decided not to call her as a witness is all but overwhelming." 355 F.Supp. at 273. Cf. United States v. Mendez-Rodriguez, 450 F.2d 1 (9 Cir. 1971). That fact must be considered in the context of the failure of appellants to take any steps that might have allowed them to locate, and ultimately to depose, Mrs. Wuensche prior to her departure from the country, despite the district court's finding that "The potential usefulness of Mrs. Wuensche as a witness was necessarily obvious to each of the defendants." 355 F.Supp. at 272. In that context, we conclude that the government cannot be said to have "deliberately" sequestered and removed a witness "whose high value to the defense could not have escaped the prosecutor's attention". United States v. Keogh, *supra*, 391 F.2d at 146–47.

16. The government had complete control over Mrs. Wuensche for a six month period, until just prior to the start of the trial. It should have been obvious that her presence with her husband during the period relevant to the trial and her knowledge of the meetings relevant to the conspiracy charge made her a potential witness for both sides, and that defense counsel would want the opportunity to interview her, just as counsel for the government had already done. Despite this, the government kept her incommunicado during the pretrial period and then, one month before the trial was set to begin, allowed her to leave the Country and go beyond the power of the district court to compel her attendance.

Thus, while it cannot be said that the departure of Mrs. Wuensche without prior notice to appellants was "inadvertent", neither can it be said that the government's conduct was so egregious as to preclude the court from considering the harm that resulted therefrom. United States v. Mayersohn, *supra*, 452 F.2d at 526. As we have noted above, no substantial interest of any appellant was prejudiced by the absence of Mrs. Wuensche as a trial witness. Unlike other cases which have dealt with problems of this sort, see United States v. Mendez-Rodriguez, *supra*, 450 F.2d at 3,[17] we are not under the disability of having to speculate as to the existence of prejudice. We have had the benefit of being able to scrutinize the deposition of Mrs. Wuensche; and we are left with the firm conviction that her testimony, had it been available at trial, would have had no effect on the outcome of the case, except possibly to strengthen the government's evidence on the fugitive harboring count upon which appellants were acquitted. Cf. United States v. Miller, 411 F.2d 825, 832 (2 Cir. 1969).

We therefore hold that, while the government's conduct with respect to Mrs. Wuensche was deplorable, it nevertheless did not sink to such a level as to remove from the balance pans to be weighed on appeal the harm that resulted; that appellants have failed to demonstrate any prejudice resulting from their inability to call Mrs. Wuensche at trial; and, consequently, that no basis for reversal has been shown.

## V.

■ Appellants' only other claim of error which warrants brief mention is the claim of misconduct on the part of the government in permitting co-defendant Scially to participate in conferences with other defendants, including pretrial conferences, after he began to cooperate with the government. Four months after the filing of the indictment, in a development unknown to his co-defendants, Scially began cooperating with the government.[18] Thereafter, he participated as a defendant in two pretrial conferences held in the presence of the trial judge and counsel for both sides.

Appellants, in support of their claim of error in this regard, rely chiefly upon two decisions by the Court of Appeals for the District of Columbia Circuit for the proposition that a surreptitious invasion by a government agent into the legal camp of the defense may violate the protection of the Sixth Amendment, at least where the invasion is sufficiently pervasive and pernicious. Caldwell v. United States, 205 F.2d 879 (D.C. Cir. 1953); Coplon v. United States, 191 F. 2d 749 (D.C. Cir. 1951), cert. denied, 342 U.S. 926 (1952).[19] Cf. Hoffa v. United States, 385 U.S. 293, 306 (1966). The facts of the instant case fall far short of the mark of those cases.

First, it appears that the only important contact that Scially had with the other defendants following the commencement of his cooperation with the government was at the two pre-trial conferences mentioned above, in the presence of both the trial judge and counsel for the parties. Moreover, the government categorically denies that it received any information from Scially regarding defense strategy. Cf. United States ex rel. Cooper v. Denno, 221 F.2d 626, 629 (2 Cir.), cert. denied, 349 U.S.

17. In *Mendez-Rodriguez*, the three witnesses obviously wanted to stay in the United States but were returned to Mexico by the government. In the instant case, Mrs. Wuensche wanted very much to return to England. We do not regard the government's failure to keep her here when she wanted to return to England as serious as its spiriting an unwilling witness out of the Country.

18. Prior to his testimony at trial, Scially's cooperation consisted primarily of appearing, in July 1971, before the same grand jury that had returned the instant indictment.

19. *Caldwell* involved a paid informant who frequently attended defense meetings and reported these conversations to the government. In *Coplon*, the government had wiretapped the defendant's telephone and intercepted privileged communications between her and her attorney.

968 (1955). Further, there was no attempt whatever to elicit at trial any testimony from Scially as to conversations overheard by him subsequent to his decision to cooperate.[20]

Thus, while we believe that such tactics are beneath the high standards of professional conduct expected of government counsel, we do not find such tactics to be so condemnable as to warrant automatic reversal. Prejudice to appellants must be considered. Finding none, we hold that no substantial right of appellants has been infringed.

## VI.

We have carefully considered the other claims of error raised by appellants and find them to be without merit.

Finally, the most noteworthy aspect of this case, in our view, is the highly commendable manner in which Judge Dooling handled the difficult problems with which he was confronted. At every stage of the proceedings, his skill and fairness in protecting the rights of the parties comported with the highest standards of the federal judiciary.

Affirmed.

20. This, presumably, was largely the result of a direction by the trial judge that Scially's testimony was to be limited to events which occurred prior to the filing of the indictment.