**UNITED STATES of America**

**v.**

**Sheikh Mohammad TARIQ.**

**Crim. No. W–81–092.**

United States District Court, D. Maryland.

Aug. 25, 1981.

Russell T. Baker, Jr., U. S. Atty., Paul R. Kramer, Deputy U. S. Atty., Baltimore, Md., for the Government.

Fred Bennett, Federal Public Defender, Paul F. Kemp, Asst. Federal Public Defender, Baltimore, Md., for defendant.

WATKINS, Senior District Judge.

I

This matter is before the Court on defendant Tariq's Supplemental Motion to Dismiss Count I and also on the Government's Motion for Court to Reconsider/Rehearing Dismissal of Count II. The defendant's motion will be granted and the Government's motion will be denied.

Sheikh Mohammad Tariq was charged with harboring two illegal aliens, Ali Hussain and Farid Ud-din, in violation of 8 U.S.C. § 1324.[1] Count I charges that the defendant harbored Ali Hussain, while Uddin is the subject of Count II. The factual setting of the case is relatively simple.[2] On February 17, 1981, agents of the United States Immigration and Naturalization Service (hereinafter referred to as "INS")

---

1. The statute provides:

(a) any person . . . who—

. . . .

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation;

. . . .

any alien . . ., not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring. 8 U.S.C. § 1324. In this opinion, this Court uses the term "harboring" as a term of art which describes the various activities prohibited by § 1324.

2. The facts described in this Memorandum Opinion and Order were brought out in the pleadings; at the April 28, 1981 hearing on the Motion to Dismiss; at the March 22, 1981 hearing on the motion to reconsider the denial of the dismissal motion; at the June 25, 1981 suppression hearing; and at the July 2, 1981 hearing on the instant motion. Thus, the factual findings in this Memorandum Opinion and Order are to be considered as findings only for purposes of the instant motions.

went to Showell Farms, which is located in Maryland, in order to apprehend certain illegal aliens. While at Showell Farms, the agents took Zahid Hussain, an illegal alien, into custody, and they questioned, but did not arrest, Ali Hussain. Later that day the INS agents determined that, despite his assertions to the contrary, Ali Hussain was actually an illegal alien. On February 18, 1981, the INS agents began to search for Ali Hussain. They received information from Zahid Hussain that Ali Hussain might be found at the defendant's residence in Berlin, Maryland. The INS agents drove to Berlin and enlisted the aid of the local police chief. Chief Mays told the agents where the defendant lived, and along with one of his deputies, accompanied INS agents Graber and Simmons as they went to the defendant's residence.

At the time that the agents went to the defendant's home, they were looking only for Ali Hussain and had no reason to suspect the defendant of any crime. When the agents and police arrived at the defendant's residence they split into groups. Although the testimony of the INS agents at the suppression hearing was unclear, it is certain that, at a minimum, agents and police went to both the front and back doors of the house. After some delay, the defendant "invited" the agents and police into the house,[3] which was owned by the defendant's father-in-law, Mr. Showell. The defendant occupied a bedroom in the house.

In the living room, the agents engaged in a protracted discussion with the defendant, who, apparently, was not free to leave. This discussion included, *inter alia*, questions concerning Ali Hussain. The agents informed the defendant that Ali Hussain was an illegal alien; that it is a crime to harbor an illegal alien; and that to lie to the agents concerning the presence of Ali Hussain would constitute the crime of harboring an illegal alien. The defendant denied knowing Ali Hussain and also stated that he was alone in the house; however, the agents became suspicious when they heard noises coming from a closed bedroom. *See also* n. 3, *supra*. The type of noise which the agents heard was not described to the Court.

Agent Simmons requested permission to use the defendant's telephone in order to obtain a search warrant. The defendant gave Simmons permission to use the telephone; however, the noise of other conversations in the living room interfered with agent Simmons' telephone call. Therefore, she gestured toward the defendant's bedroom with the telephone handset so as to request permission to move the telephone into the bedroom. The defendant nodded his acquiescence, thereby consenting to the intrusion. When agent Simmons moved into the defendant's open bedroom, she found three suitcases in plain view. The suitcases had tags on them which bore the names of Ali Hussain, Farid Ud-din, and Zahid Hussain,[4] and agent Simmons was able to read the names on the tags without difficulty. Confronted with this evidence, the defendant recanted in part, admitting that he knew Ali Hussain but still denying that Ali Hussain was present.

The defendant had also told the agents that he did not know how to contact Mr. Showell, the owner of the house, and that the locked bedroom belonged to Showell's son. Purely by coincidence Mr. Showell arrived at the house. The agents reported that Mr. Showell stated that the defendant knew how to contact him, knew that Showell's son had moved out of the

3. The testimony was unclear as to which law enforcement officer entered which door. Agent Graber walked through the kitchen where he noticed several place settings on the table. The agent was of the opinion that the existence of several place settings was inconsistent with the defendant's assertion that he was alone in the house. This inconsistency, among others, aroused his suspicion.

4. Zahid Hussain was in custody and was being held in a Government vehicle which was parked near the defendant's residence. Simmons brought him into the house to identify and claim his suitcase. Simmons testified that, although she did not recall any conversation between Zahid Hussain and the defendant, it was possible that such a conversation occurred in Pakistani.

house, knew that a friend of the defendant rented the bedroom,[5] and also knew that he, Showell, had a key to the room. Mr. Showell unlocked the door of the bedroom which Ud-din rented.[6] The agents found Ali Hussain kneeling by a bed and they took him into custody. Ali Hussain silently pointed toward the bed, and this caused the agents to look under the bed, where they found Farid Ud-din, who was then arrested. At this time the defendant was also arrested and informed of his *Miranda* rights.[7] The arrest occurred on February 18, 1981 and the Federal Public Defender was appointed to represent the defendant on that same day. Tariq was charged with two

counts of violating 8 U.S.C. § 1324 by harboring Ali Hussain and Ud-din. The indictment was filed on February 24, 1981. On February 19 and February 24, 1981, Ud-din and Ali Hussain were interviewed by INS agents and sworn *ex parte* statements were taken from them. These affidavits and statements were *not* formal depositions. Apparently, Zahid Hussain was not interviewed. On February 24, 1981, Ali Hussain, Zahid Hussain, and Farid Ud-din were deported to Pakistan.[8] Paul Kemp, Esquire, Assistant Federal Public Defender, entered his appearance on February 27, 1981, three days after the deportation and nine days after his office had been appointed as coun-

5. The friend is apparently Farid Ud-din.

6. Because the INS agents were of the opinion that Mr. Showell had validly consented to a search of the room, they did *not* obtain a search warrant. This opinion is an erroneous view of the law. Generally a landlord does not have the authority to consent to a search of the demised premises. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Stoner v. California*, 376 U.S. 483, 488–89, 84 S.Ct. 889, 892–93, 11 L.Ed.2d 856 (1964); *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *United States v. Block*, 590 F.2d 535, 539–43 (4 Cir. 1978); Cook, *Constitutional Rights of the Accused—Pretrial Rights* § 53 (1972), 341. *Cf. United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2 Cir. 1981). Although there was some testimony that Mr. Showell resided in the house, there was also an indication that Showell was "staying at a house close to the [defendant's] residence . . . ." Paper No. 10 at p. 3. There was no evidence which would support a finding that he had a right of access to Ud-din's room. Therefore, he was merely a landlord and could not validly consent to a search of the demised premises.

The defendant did not raise the consent issue, presumably because his personal privacy interests were not disturbed by the improper search of Ud-din's room, *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (due process—supervisory power); *see United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and Ud-din, whose privacy interests were infringed, has been deported. Furthermore, it is unlikely that any suppressible evidence was obtained in the search.

7. The defendant did not move to suppress any statements which he made prior to being informed of his *Miranda* rights, nor did he move

to suppress subsequent statements as tainted. Tariq was in custody from the time that the INS agents and police arrived at his residence. On June 15, 1981, for example, INS agent Graber testified that agents and police went to both the front and back doors of the residence. INS agent Simmons testified that the agents asked the defendant for his identification papers, and when the defendant went to get his papers, the agents stayed close to him in order to "prevent flight." On cross-examination, Graber stated that it was possible that he asked for and held onto the defendant's identification papers. These restrictions on defendant's liberty indicate that the defendant had been placed in custody.

The defendant was interrogated about a crime while he was in custody, because, for example, the agents, after having discovered the deported aliens' suitcases in plain view, questioned the defendant about Ali Hussain. This questioning allegedly resulted in an incriminating statement and it occurred before the two illegal aliens were discovered in Ud-din's room, before the defendant was formally arrested, and before the defendant was informed of his *Miranda* rights.

The *Miranda* issue, not having been raised or argued by the defendant, will not be decided by the Court. Because the indictment is being dismissed, the defendant is in no way prejudiced by the decision not to dispose of the *Miranda* issue *sua sponte*.

8. The deportation was a unilateral act of the Government. *See United States v. Gonzales*, 617 F.2d 1358, 1363 (9 Cir. 1980) (*per curiam*), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). The prosecution did not seek a court order (beyond the administrative hearing) authorizing the deportation. *Cf. United States v. Carrillo-Frausto*, 500 F.2d 234 (9 Cir. 1974).

sel.[9] At the arraignment on March 6, 1981, the United States Attorney provided defense counsel with copies of the sworn statements of Ali Hussain and Farid Ud-din. On March 17, 1981, defense counsel began[10] to search for Ud-din and Ali Hussain, and he discovered that they had been deported, three days before he had entered his appearance and before he was able to interview them.

■ Neither the Government nor defense counsel has attempted to locate the deported aliens. Presumably, they are in Pakistan, or perhaps India. It is undisputed that the deportees are outside the jurisdiction of this Court.[11]

## II

■ The issue before the Court is whether the defendant's fifth amendment right to due process and his sixth amendment rights to compulsory process and confrontation[12] were violated by the Govern-

---

**9.** The defendant's motion to dismiss the indictment is based on the theory that three illegal aliens who were potential defense witnesses were deported prior to the time that Mr. Kemp entered his appearance and before Mr. Kemp could interview the deportees. Although Mr. Kemp entered his appearance AFTER the aliens had been deported, the office of the Federal Public Defender was appointed BEFORE the deportation.

This Court could conceivably ground a denial of the motion to dismiss on the theory that the defendant waived his right to compulsory process because defense counsel failed to act promptly. *See United States v. Avila-Dominguez,* 610 F.2d 1266, 1269 (5 Cir. 1980); *United States v. Castillo,* 615 F.2d 878 (9 Cir. 1980). Once the Federal Public Defender was appointed to represent the defendant, he was no longer unrepresented, and staff lawyers in the same office have the burden of letting the left hand know what the right hand is doing. *See Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971).

This Court, however, does not find that the defendant has waived his rights. First, the prosecution has not urged the waiver theory. Second, on the facts presented, the Court does not find that the defendant made a voluntary, knowing, and understanding waiver of his rights. *Cf. United States v. Lujan-Castro,* 602 F.2d 877 (9 Cir. 1979) (*per curiam*), *cert. denied,* 444 U.S. 945, 100 S.Ct. 306, 62 L.Ed.2d 314 (1979). Third, the Court is of the opinion that the Office of the Federal Public Defender has acted with reasonable promptness, and the Court recognizes that minor administrative delay is incumbent in any bureaucratic organization.

**10.** On March 5, 1981, the defendant filed a Motion for Discovery and Inspection, dated March 4, 1981, in which he requested the present address and phone number of Ali Hussain and Ud-din. On March 6, 1981, the Government responded that all discovery problems had "been worked out" and that the motion was moot.

**11.** In many of the deportation of witnesses cases, the parties have made a concerted effort to locate the deportees. *United States v. Valenzuela-Bernal,* 647 F.2d 72 (9 Cir. 1981); *United States v. Calzada,* 579 F.2d 1358 (7 Cir. 1978), *cert. dismissed,* 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978); *United States v. McQuillan,* 507 F.2d 30 (9 Cir. 1974); *United States v. Tsutagawa,* 500 F.2d 420 (9 Cir. 1974); *United States v. Mendez-Rodriguez,* 450 F.2d 1 (9 Cir. 1971); *United States v. Winnie Mae Manufacturing Co.,* 451 F.Supp. 642, 648–49 (C.D.Cal.1978). As a general rule, the Government need not act to locate witnesses for the defendant; however, where the Government makes material witnesses unavailable to the defendant, it bears the burden of locating the witnesses. *Singleton v. Lefkowitz,* 583 F.2d 618, 624 (2 Cir. 1978), *cert. denied,* 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 486 (1979); *Mendez-Rodriguez,* 450 F.2d at 5.

In the instant case, the Government, being of the opinion that the deportees are not material witnesses, has not attempted to locate them, despite the fact that it made them unavailable to defendant. Defense counsel has also failed to use the inexpensive techniques of attempting to locate deportees which were described in the cited authorities, although this failure may be due to insufficient data. The Court assumes that the deported aliens are unavailable for either an interview or a deposition. *Cf. United States v. Mosca,* 475 F.2d 1052 (2 Cir. 1973), *cert. denied,* 412 U.S. 948, 93 S.Ct. 3003, 37 L.Ed.2d 1001 (1973) (deposition of witness taken in England).

This assumption is not, however, critical to the resolution of the instant motions. In *Valenzuela-Bernal,* the Ninth Circuit stated that the vice in a deportation of witnesses case is to place the witnesses beyond the subpoena power of the Court so that for all practical purposes they are beyond the defendant's reach. That is the situation in the case at bar.

**12.** The fifth amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law ...." The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witness-

ment's unilateral deportation of Ali Hussain, Zahid Hussain, and Farid Ud-din on February 24, 1981, and if so, whether the indictment should be dismissed.[13] The leading case on this issue, *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9 Cir. 1971) has been followed, *United States v. Calzada*, 579 F.2d 1358 (7 Cir. 1978), *cert. dismissed*, 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978), limited, *United States v. Martinez-Morales*, 632 F.2d 112 (9 Cir. 1980), distinguished, *United States v. Hung*, 629 F.2d 908, 928–29 (4 Cir. 1980); *United States v. Verduzco-Macias*, 463 F.2d 105 (9 Cir. 1972), *cert. denied*, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972); *United States v. Mosca*, 475 F.2d 1052, 1060 (2 Cir. 1973), *cert. denied*, 412 U.S. 948, 93 S.Ct. 3003, 37 L.Ed.2d 1001 (1973), explained, *United States v. McQuillan*, 507 F.2d 30 (9 Cir. 1974), and reaffirmed, *United States v. Valenzuela-Bernal*, 647 F.2d 72 (9 Cir. 1981); *United States v. Lujan-Castro*, 602 F.2d 877, 878 (9 Cir. 1979) (*per curiam*), *cert. denied*, 444 U.S. 945, 100 S.Ct. 306, 62 L.Ed.2d 314 (1979).

In *Mendez-Rodriguez*, the district court denied a motion to dismiss the indictment, and after the defendant was convicted, the Ninth Circuit reversed. The three-count indictment charged the defendant with conspiracy and transportation of illegal aliens. Three of the six aliens who were allegedly transported by the defendant were deported by the Government, before defense counsel was able to interview them, in order to avoid the financial burden of detaining the illegal aliens for six months or longer while the defendant awaited trial. *Cf.* 18 U.S.C. § 3161 (Speedy Trial Act: 70 day limit). The Ninth Circuit held that the deportation violated the defendant's rights to due process and compulsory process. It was clear that the defendant had been prejudiced at trial by the premature deportation because his version of the incident differed from the INS version and the deportees might have corroborated the defendant's version; however, the court explicitly stated that a defendant need not show that the deportees' testimony would have been favorable to him because it was impossible for the defendant to ascertain what the deportees might have said if they had been interviewed before trial or called as witnesses. 450 F.2d at 5.

■ *Mendez-Rodriguez* demonstrates that the question before a court on a motion to dismiss due to a premature deportation is *not* one of the sufficiency of the evidence.[14] In *Mendez-Rodriguez*, the appellant did not question the sufficiency of the evidence. Nevertheless, the conviction was reversed because the Government had interfered with the defendant's ability to prepare his

---

es against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ."

The defendant has raised the confrontation issue. Most of the deportation cases, however, discuss only due process and compulsory process. *E. g.*, *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9 Cir. 1971). Because the Government does not intend to call any of the deported aliens and also does not intend to use their sworn statements at trial, there is no need to address the confrontation clause question.

The confrontation clause is not offended by the use of hearsay in a preliminary hearing. *See United States v. Matlock*, 415 U.S. 164, 175, 94 S.Ct. 988, 995, 39 L.Ed.2d 242 (1974) (use of hearsay in a suppression hearing is permissible).

**13.** The defendant has argued that his conduct, if proved, would not constitute a crime because it is excused by the employment proviso of 8 U.S.C. § 1324. The Court holds that defendant's conduct, as proffered to the Court in the motion hearings, see n. 2 *supra*, is not protect-

ed by that proviso, which reads: "*Provided, however*, That for purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." Ali Hussain and Ud-din were found in a locked bedroom which Ud-din rented. Ali Hussain was kneeling near the bed while Ud-din was hiding under the bed. Even if Tariq was an employer, and there is no evidence to this effect, this is not a "usual and normal" practice "incident to employment." *See United States v. Herrera*, 584 F.2d 1137, 1144–45 (2 Cir. 1978); *United States v. Winnie Mae Manufacturing Co.*, 451 F.Supp. 642 (C.D.Cal.1978); *United States v. Mt. Fuji Japanese Steak House, Inc.*, 435 F.Supp. 1194, 1202 (E.D.N.Y.1977).

**14.** This Court is of the opinion that the Government has produced evidence which, if accepted by the finder of fact, would be sufficient to sustain a conviction.

own case. *Accord, Castillo,* 615 F.2d at 882. *But cf. Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Motes v. United States,* 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900) (*confrontation* clause violation is harmless if evidence of guilt is overwhelming).

The Fourth Circuit has not ruled on the precise issue which is now before this Court, *see United States v. Hung,* 629 F.2d 908 (4 Cir. 1980); however, the Fourth Circuit's opinion in *Bray v. Peyton,* 429 F.2d 500 (4 Cir. 1970) (*per curiam*), is applicable. In *Bray,* the district court denied a petition for a writ of habeas corpus and the Fourth Circuit reversed. The Government had interfered with a witness by reinstating charges which had been dropped. This action frightened other witnesses, thereby obstructing the defendant's offer of exculpatory proof.[15] The Fourth Circuit held that the Government's action violated the defendant's fifth and sixth amendment rights.

In *Bray,* the Government had intimidated defense witnesses, and the Court wrote: "Even if not deliberate, the prosecuting official obviously obstructed the defendant's offer of exculpatory proof. A blow to our adversary system, it was *inherently prejudicial.*" 429 F.2d at 501 (emphasis added). In a *Mendez-Rodriguez* situation, the Government has acted unilaterally to deport material witnesses, and that is more egregious than the wrong inflicted in *Bray.* Therefore, this Court is of the opinion that the Fourth Circuit would follow the *Mendez-Rodriguez* line of cases and strongly disapprove of the premature unilateral deportation of potential material witnesses. *See also Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).[16]

The four factors involved in *Mendez-Rodriguez* were explained by the Ninth Circuit in *United States v. McQuillan,* 507 F.2d at 32–33. First, in *Mendez-Rodriguez,* there was a selective deportation of some of the witnesses. Second, there was no question but that the deportees were eyewitnesses [17] to, and active participants in, the crime because the illegal aliens had been passengers in the defendant's automobile. Third, at trial the defendant offered an alibi and the deportees might have corroborated the defendant's alibi. Finally, al-

---

**15.** In *Bray,* the Government interfered with defense witnesses, and, accordingly, the defendant was prejudiced by the Government's actions. The Fourth Circuit, therefore, did not have to reach the question of what action a Court should take where the witnesses were merely potential defense witnesses. In *Hung,* 629 F.2d at 929, the missing witness was protected by diplomatic immunity, and, therefore, the Fourth Circuit imposed a requirement that prejudice be shown by the defendant. Furthermore, the Government has a greater interest in taking speedy action against diplomats who misbehave than it has in routine deportations. *Id.* The deportees in the instant case were not errant diplomats and were not protected by an immunity, and this serves to distinguish *Hung* and the prejudice requirement which it imposes.

**16.** In *Brady,* 373 U.S. at 86–87, 83 S.Ct. at 1196, the Supreme Court addressed suppression of evidence by the prosecution, holding that the suppression of material evidence violates the due process clause. The Court wrote that *United States ex rel. Almeida v. Baldi,* 195 F.2d 815 (3 Cir. 1952), *cert. denied,* 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341 (1953), "state[s] the correct constitutional rule." The Supreme Court continued by noting that the Third Circuit in *Baldi* was of the opinion "that the 'sup-

pression of evidence favorable' to the accused was itself sufficient to amount to a denial of due process." 373 U.S. at 87, 83 S.Ct. at 1196. Unlike *Brady,* in a *Mendez-Rodriguez* situation, it is impossible to ascertain with certainty whether the deportees' testimony would be "favorable" to the accused.

**17.** Where a deportee was not connected to the crime, the Ninth Circuit has stated that a "bare assertion" that a deportee was an eyewitness and that the deportee might have exonerated the defendant is insufficient. *Martinez-Morales,* 632 F.2d at 115. The Seventh Circuit, however, has stated that where the illegal aliens are the subject of the crime, the *McQuillan* requirement that the deportee be an actual witness is satisfied. *United States v. Calzada,* 579 F.2d 1358 (7 Cir. 1978), *cert. dismissed,* 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978). Even in the Ninth Circuit, all that is necessary is that the deportee be a witness who "may" be involved in the offense. *Valenzuela-Bernal,* 647 F.2d at 73 (citation omitted). This Court concludes that where a deportee is the *corpus delicti,* and where the deportee may have been involved in the offense, the "eyewitness" requirement has been rebuttably satisfied.

though the appellant could not show that the deportees' testimony would have been helpful, there "was at least a strong probability that the missing witnesses could have provided material and relevant information concerning the events constituting the crime." *Id.* Because, however, the deportees in *McQuillan* had not witnessed the crime, and there was nothing to indicate the "barest possibility" that their testimony could be of "any benefit" to the accused, there was no infirmity in deporting them before they could be interviewed by defense counsel. 507 F.2d at 33.

More recently, the Ninth Circuit listed two vital factors in a *Mendez-Rodriguez* violation. In *United States v. Valenzuela-Bernal*, 647 F.2d 72 (9 Cir. 1981), the district court denied a motion to dismiss and the Court of Appeals reversed. The defendant was apprehended while he was driving a car with some illegal aliens in it. The aliens were interrogated by the Border Patrol. Because they said nothing which *exculpated* the defendant, some of them were deported. *Quoting United States v. Tsutagawa*, 500 F.2d 420 (9 Cir. 1974), the Court wrote:

> The thrust of *Mendez-Rodriguez* is to prevent the basic unfairness of allowing the government to determine which witnesses will not help either side and then to release those witnesses, for all practical purposes, beyond the reach of the defendant. The vice lies in the unfettered ability of the government to make the decision unilaterally. A defendant has the right to formulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense.

647 F.2d at 73–74. *Accord, Castillo,* 615 F.2d at 882. The Ninth Circuit applied and reaffirmed *Mendez-Rodriguez,* stating:

"The *Mendez-Rodriguez* doctrine sweeps broadly." *Id.* at 74. It reiterated that a defendant need not show specific prejudice. *Id.*[18] The court stated that it will apply *Mendez-Rodriguez strictly* if two essential elements are present. "Those elements are (1) unilateral Government action denying a defendant access to a witness; and (2) *prejudice, i. e., loss of a conceivable benefit* to the defendant from the missing witness's testimony." *Id.* at 75 (emphasis added). This Court emphasizes that the conviction was reversed in *Valenzuela-Bernal* despite the fact that the deportees had not exculpated the defendant in any way when they were questioned by the Border Patrol.[19]

The requirement that prejudice be shown has been the subject of considerable analysis. In the Fifth Circuit, a defendant must demonstrate a "colorable need" for the deportee's testimony. *Ashley v. Wainwright,* 639 F.2d 258, 262 (5 Cir. 1981). As stated above, in the Ninth Circuit loss of a "conceivable benefit" constitutes prejudice. *Valenzuela-Bernal,* 647 F.2d at 75. The Seventh Circuit wrote that a "defendant need not show prejudice to his or her case arising from the government's violation of the right to compulsory process by deporting eyewitnesses to the crime at issue." *Calzada,* 579 F.2d at 1362; *see United States v. Lopez,* 615 F.2d 1363 (6 Cir. 1980) (actual prejudice) (unpublished: pursuant to 6th Cir. R. 11, unpublished opinions are not to be cited to that court of appeals; *cf.* 4th Cir. R. 18(d)(iii)); *cf. Mosca,* 475 F.2d at 1059 (two dimensional approach in which requisite showing of prejudice varies inversely to gravity of prosecution's misconduct); *Singleton v. Lefkowitz,* 583 F.2d at 623 (where the Government has made a witness unavailable, "the showing of favorable testimony that is required of the defendant is relaxed"). This Court is of the opinion that in order for there to be a

---

**18.** To the extent, if any, that *McQuillan,* 507 F.2d at 32–33, required a "strong probability" of prejudice, it was repudiated by *Valenzuela-Bernal,* 647 F.2d at 74.

**19.** *But cf. Martin-Mendoza v. Immigration and Naturalization Service,* 499 F.2d 918 (9 Cir. 1974), *cert. denied,* 419 U.S. 1113, 95 S.Ct. 789, 42 L.Ed.2d 810 (1975). In *Martin-Mendoza,* the court saw no impropriety in deporting an alien whose statements were not favorable to Martin-Mendoza; however, *Martin-Mendoza* was a civil deportation case while the instant case involves a criminal offense.

denial of compulsory process, there must have been some prejudice to the defendant by the Government's action because the sixth amendment protects only the defendant's right "to have compulsory process for obtaining witnesses *in his favor* ...." (Emphasis added.) *See Singleton v. Lefkowitz*, 583 F.2d at 627–28 (Mansfield, J., dissenting opinion).

After reviewing the entire *Mendez-Rodriguez* line of cases, this Court is of the opinion that the Government violates a defendant's fifth amendment right to due process and his or her sixth amendment right to compulsory process when it acts unilaterally in a manner which interferes with the defendant's ability to discover, to prepare, or to offer exculpatory or relevant evidence, by deporting a witness who is an illegal alien, if the Government knows or has reason to know that the witness's testimony could conceivably benefit the defendant and if the deportation occurs before defense counsel has had notice and a reasonable opportunity to interview and/or depose the illegal alien.[20] The Court also imposes a duty of reasonable diligence upon defense counsel. *United States v. Avila-Dominguez*, 610 F.2d 1266 (5 Cir. 1980). This rule is based on the conclusion that such a premature deportation improperly interferes with the defendant's ability to prepare his or her case, and such interference undermines the basic tenets of the adversarial system of justice. Thus, even if the Government's evidence is sufficient to support a conviction, if the defendant has been improperly hindered in preparing or presenting a defense, a constitutional violation must be found to have occurred.[21]

It is difficult to apply the conceivable benefit test of prejudice. As the Ninth Circuit stated in *Mendez-Rodriguez*, and as the Seventh Circuit indicated in *Calzada*, the very acts of which the defendant complains preclude the defendant from making a showing of prejudice. How, for example, can Tariq demonstrate that he could conceivably benefit from the testimony of Ali Hussain, Zahid Hussain, and Farid Ud-din, when those illegal aliens were deported before his attorney could interview them?

In the instant case, the Government argues that Tariq could testify at the hearing on the motion to dismiss the indictment, thereby concretely demonstrating that he was prejudiced. Aside from the tactical disadvantages of this course of action, defense counsel argues that this forces the defendant to choose between his privilege not to incriminate himself and his rights to due process and compulsory process.[22]

**20.** This Court rejects any requirement that there be a selective deportation of witnesses, as occurred in *Mendez-Rodriguez*. *McQuillan*, 507 F.2d at 32–33. Certainly, a selective deportation carries an aura of impropriety because it may appear that witnesses favorable to the defendant were deported while unfavorable witnesses were retained. This would indicate bad faith on the part of the prosecution; however, a showing of bad faith is *not* necessary to a *Mendez-Rodriguez* violation. *United States v. Martinez-Morales*, 632 F.2d 112 (9 Cir. 1980); *United States v. Loud Hawk*, 628 F.2d 1139, 1158 (9 Cir. 1979) (Hufstedler, J., dissenting opinion), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980).

Deportation of all of the witnesses, as occurred in the instant case, avoids the above-stated vice; however, it is an exercise of absolute selectivity. It would be absurd to hold that a constitutional violation occurs if one of two witnesses is deported, but no such violation occurs when both witnesses are deported.

The Court wishes to emphasize that it is of the opinion that the Government has acted in good faith throughout this matter, although that fact is legally irrelevant.

**21.** Where defense counsel is given a reasonable opportunity to interview illegal aliens who are potential material witnesses, and where the Government, acting in good faith, makes a reasonable judgment that the aliens could not assist the defendant, it may be permissible to deport the aliens without notifying defense counsel prior to the deportation. *Castillo*, 615 F.2d at 882. This Court does not recommend such a practice, unless prior notice of the pending deportation is given, and is *not* presented with that situation in the case at bar.

**22.** In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court held that a defendant could testify at a fourth amendment suppression hearing without waiving his or her privilege against self-incrimination; however, such testimony may be admissible for impeachment purposes, *United States v. Salvucci*, 448 U.S. 83, 93 n.8, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980).

In *Valenzuela-Bernal*, 647 F.2d at 74, the Ninth Circuit proposed one solution to this dilemma by, in effect, creating a presumption of prejudice in certain situations. If a deported alien was an eyewitness to the crime, the defendant has been prejudiced by the deportation, *accord, Calzada*, 579 F.2d at 1362; however, if the deportee was not an eyewitness, the court will not assume that the deported witness could conceivably benefit the defendant. 647 F.2d at 74.

Another solution was developed in *Avila-Dominguez*, 610 F.2d at 1270. There, the Fifth Circuit wrote: "It does not damage the underlying purpose of the Fifth Amendment to require that at least in counsel's brief or argument, some suggestion be made as to how the deported witness might advance the cause of revealing the truth." 610 F.2d at 1270. This has been described as a requirement of "an offering of at least some plausible theory of how the testimony of the witnesses would help [the defendant]." *United States v. Arrendondo-Mo-*

*rales*, 624 F.2d 681, 686 (5 Cir. 1980).[23] Of course, the defendant could go beyond this and testify personally at the motion hearing in order to show prejudice.

A third alternative was proposed by the Government in the instant case. Here, the Government has asked the Court and the defendant to rely on affidavits prepared by INS. These hearsay documents purport to represent the sum and substance of the deported aliens' testimony.

▮▮▮▮▮ This Court adopts the following guidelines. Where a deported alien is an "eyewitness"[24] to, or an active participant in, the crime, the Court will rebuttably presume that the defendant was prejudiced by any premature deportation.[25] If, however, the deportee did not witness or participate in the offense charged, the Court will not assume prejudice, i. e., loss of a conceivable benefit, and will require some colorable suggestion of prejudice. This suggestion may take the form of a reasonable, articula-

On its facts, *Simmons* is limited to testimony offered at a fourth amendment suppression hearing, and it does not, for example, bar the introduction at trial of inculpatory statements made during an eighth amendment bail hearing. *United States v. Dohm*, 618 F.2d 1169, 1173 (5 Cir. 1980) (en banc). This Court is convinced that, under the rationale of both *Simmons* and *Dohm*, if a defendant elects to testify at a fifth and sixth amendment hearing in order to establish prejudice by the Government's deportation of potential witnesses, that testimony would not constitute a waiver of the privilege against self-incrimination. *See Avila-Dominguez*, 610 F.2d at 1270; *United States v. Inmon*, 568 F.2d 326, 332–33 (3 Cir. 1977) (testimony at preliminary hearing to establish double jeopardy violation does not waive privilege at trial); *Dohm*, 618 F.2d at 1177 n.1 (Tate, J., concurring in part and dissenting in part) (entry of a limiting order by the court).

This Court need not, and does not, reach this issue because the Court is of the opinion that the prosecution has failed to meet its burden of producing enough evidence to demonstrate that the defendant was not prejudiced by the unilateral deportation of potential witnesses who actively participated in the crime. *See* discussion, *infra*. Therefore, even if, in some circumstances, the burden of production should shift to the defendant, this is not such a case.

**23.** *Arrendondo-Morales* is distinguishable from the instant case on its facts, because, for example, defense counsel was given prior notice of

the deportation and an opportunity to interview the illegal aliens. 624 F.2d at 685. On these facts, the court held that a defendant who fails to avail himself of this opportunity must show prejudice.

*Avila-Dominguez* did not hold that a defendant need only show a "slight suggestion" of prejudice. *Ashley v. Wainwright*, 639 F.2d 258, 261 (5 Cir. 1981). Instead, a defendant must "demonstrate a colorable need for the missing witness's testimony." *Id.* at 262.

**24.** This term includes witnesses who perceive the crime through any of their natural senses, e. g., they hear the crime. *See also* n.17 *supra*. The term "percipient" witness would be more accurate. *United States v. Sanchez-Murillo*, 608 F.2d 1314 (9 Cir. 1979); *Winnie Mae Mfg. Co.*, 451 F.Supp. at 648.

**25.** When a rebuttable presumption arises, courts must determine the quantum of proof which must be produced in order to rebut the presumption. In the case at bar, this Court will assume that the presumption of prejudice can be rebutted by a mere preponderance of the evidence. Even under this liberal standard, the prosecution has not rebutted the presumption in this case. *See* discussion, *infra*. The Court is of the opinion that a heavier burden should be imposed on the Government but, on these facts, is not faced with the question of how weighty a standard should be imposed.

ble theory which is set forth in argument, briefs, or memoranda, and the defendant need not testify. Although abstract speculation is insufficient, *United States v. Castellanos-Machorro*, 512 F.2d 1181, 1184 (9 Cir. 1975), the suggestion may be speculative as long as it is plausible and grounded in whatever facts are available. The defendant need not make a proffer of the actual substance of the deportee's testimony.

■■■ It will be noted that the above guidelines change the *Valenzuela-Bernal* rule from one which includes only eyewitnesses to one which encompasses both percipient witnesses to, and active participants in, the crime. This modification finds support in cases such as *Mendez-Rodriguez* and *McQuillan*, and, particularly, in *Calzada*. See n.17 *supra*. Because "eyewitness" is generally a more expansive category than "active participant," this change is of little substantive import; however, it makes it clear that the *Valenzuela-Bernal* rule applies when the deportees are the illegal aliens who were allegedly harbored, transported, or concealed by the defendant.[26] Thus, where a percipient witness has been deported prematurely, the defendant has made a *prima facie* case of prejudice and the burden of proof shifts to the Government. *See United States v. Loud Hawk*, 628 F.2d 1139, 1157 (9 Cir. 1979) (Hufsted-

ler, J., dissenting opinion), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed. 602 (1980).

■■■ The Court notes that if the Government provides defense counsel with prior notice of a pending deportation and an opportunity to interview and/or depose, F.R. Cr.P. 15, the aliens, the defendant's rights have been protected, because he or she can then make use of 18 U.S.C. § 3149 which provides for obtaining the presence of material witnesses. Several cases, *e. g., Tsutagawa*, 500 F.2d at 423; *Winnie Mae Manufacturing Co.*, 451 F.Supp. at 650, suggest inexpensive techniques for safeguarding the rights of the illegal aliens who would be needed as witnesses in the criminal case. Thus, it is feasible for the Government to meet the standard imposed by this Court. *See Avila-Dominguez*, 610 F.2d at 1268–70.

Where the Government has improperly and unilaterally prejudiced a defendant by prematurely deporting a percipient witness, the generally approved remedy is dismissal of the indictment. *E. g., United States v. Valenzuela-Bernal*, 647 F.2d 72 (9 Cir. 1981). The defendant in this case has moved for dismissal and, in fact, the Court has dismissed the second count.

■■■ The Government, however, argues that dismissal is too harsh and that the proper remedy, if any remedy is justified, is to suppress the tainted evidence.[27] The ar-

---

**26.** The rule enunciated by this Court presupposes that the Government is aware of the fact that the deportees participated in the offense, as in the case at bar; however, in some contexts, this knowledge will not be reasonably available to the Government. If the Government, acting reasonably and in good faith, deports aliens whom it does not know to have been involved in a criminal offense, the deportation should not adversely impact on subsequent criminal proceedings.

**27.** The Government suggests that, if any remedy for the deportation is justified, the two suitcases which it intends to introduce into evidence should be suppressed, because suppression is a remedy which is tailored to redress the Governmental impropriety; however, while the Government's suggestion is not without some logical appeal, the Government cites no authority for this suggestion. In *United States v. Vasquez-Ramirez*, 629 F.2d 1295 (9 Cir. 1980) (*per curiam*), the court suppressed two un-

signed depositions; however, *Vasquez-Ramirez* is distinguished by the fact that a magistrate had ordered the deportation of the deponents, and, therefore, a *Mendez-Rodriguez* violation had not occurred. *See United States v. Carrillo-Frausto*, 500 F.2d 234 (9 Cir. 1974). This Court is unaware of any authority which applies the exclusionary rule to a compulsory process violation.

In *United States v. Gonzalez*, 617 F.2d 1358, 1364 (9 Cir. 1980) (*per curiam*), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), the court suggested the remedy that testimony at trial be limited to events which were not witnessed by the deportees. This merely restates the *Valenzuela-Bernal* rule discussed *supra*.

The evidence available in the case at bar indicates that the deported aliens could have heard the conversation between the defendant and the INS agents. If this Court were to follow the Government's suggestion by sup-

gument that dismissal is too harsh was rejected by the Seventh Circuit in *Calzada*, 579 F.2d at 1362–63. That court of appeals stated that the Government was already on notice that it was improper to deport potential witnesses, and, therefore, the court had no sympathy for the contention that dismissal was too drastic a remedy for a mere error by the Government. This Court is in agreement. *Mendez-Rodriguez* announced the applicable rule of law a decade ago and it is now too late to ask the Court to render two constitutional rights meaningless in response to an appeal to sympathy.[28]

## III

■ In the instant case potential percipient witnesses who were active participants, *i. e.*, the *corpus delecti*, in the crime were deported before they could be interviewed by defense counsel. Such a premature deportation raises a rebuttable presumption of prejudice and justifies a dismissal of the indictment pursuant to the *Mendez-Rodriguez* line of cases, unless the Government can show that the defendant was not prejudiced by its action in deporting the illegal aliens. Here, the Government relies on five sworn statements in order to make such a showing. Exhibits 1–5 to Paper No. 11. The Court holds that, even applying a liberal preponderance of the evidence standard, the Government's rebuttal is insufficient and the defendant was prejudiced by the premature deportation of the illegal aliens.

As a preliminary matter, the Court notes that the Government's actions in this case demonstrate that it is reasonable to conclude that Ali Hussain and Ud-din were percipient witnesses. The Government took five sworn statements from these witnesses. In comparison, it did not obtain a single statement from Zahid Hussain. Therefore, the Government was, at one point, of the opinion that Ali Hussain and Ud-din were potential witnesses in this case.

■ Ali Hussain and Ud-din were potential witnesses to the crime because it is conceivable that they perceived it with their own senses. The crime charged in Count I occurred when the defendant allegedly lied to INS agents concerning his knowledge of the whereabouts of Ali Hussain. This alleged conversation took place in the living room of Tariq's residence while Ali Hussain and Ud-din were in Ud-din's nearby bedroom. The INS agents in the living room heard unspecified noises from the bedroom. If the Court were to accept the Government's sworn statements, it would appear that the noises which the agents overheard were conversations between Ud-din and Ali Hussain. *See* Exhibit 4 at p. 2 to Paper No. 11. Therefore, it is conceivable that the aliens in the bedroom overheard the defendant's conversation with the agents, and because that conversation constituted the crime with which Tariq is charged, the aliens may have "witnessed" the crime. *Cf. Valenzuela-Bernal*, 647 F.2d at 73 (aliens lying on floor of car); *Avila-Dominguez*, 610 F.2d at 1268 (aliens in car camper). No one will ever know with certainty whether the aliens in fact overheard the conversation because no one ever asked them that question; however, in a criminal prosecution, where the Court must speculate, it does so in the defendant's favor.[29] The

---

pressing the suitcases, and if it also applied *Gonzalez* so as to exclude testimony concerning the INS agents' conversation with the defendant, on the assumption that the deportees may have overheard that conversation, the Government's evidence would be insufficient to sustain a conviction. Thus, in this case, application of the less drastic remedies would produce the same result as a dismissal.

28. Furthermore, where the wrong complained of is part of an ongoing practice, a harsher remedy is justified. *Government of the Virgin Islands v. Testamark*, 570 F.2d 1162, 1168 n.15

(3 Cir. 1978). While this Court does not know whether deportation of potential material witnesses is a continuous problem in this district, the reported cases demonstrate that it is such a problem throughout the Nation. Therefore, a strong preventive measure is justified.

29. Even if Ud-din and Ali Hussain did not overhear the conversation which constituted the offense charged in Count I, their deportation has prejudiced the defendant. If the deportees were in close proximity to the scene of the crime, if they were aurally acute, and if they did not hear the conversation, their testimony

deportation of these potential percipient witnesses raises a presumption of prejudice.

Even if the deportees did not perceive the crime with their own senses, they were, as cognitive, mobile persons, active participants in that crime. For example, Ali Hussain's statement to the INS agents indicates that Ali Hussain woke Tariq up when the INS agents arrived at the residence and that he told Tariq that he and Ud-din were going to hide in Ud-din's room. Furthermore, as in *Calzada*, the deportees were the subject of the offense and this makes them active participants in the crime. *See* nn. 17, 31. The premature deportation of active participants is as egregious a constitutional violation as the improper deportation of an eyewitness and also raises a presumption of prejudice.

This presumption is strengthened by the factual context of the crime charged because the defendant's state of mind, *i. e.*, knowledge, is an element of the offense. The knowledge issue is whether the defendant knew that the illegal aliens were in Ud-din's bedroom at the time he told the INS agents that he was alone; in other words, whether the *mens rea* and the *actus reus* coincided.[30] The resolution of this issue, however, is dependent upon the factual question of how the two illegal aliens came to be in Ud-din's bedroom and that question is a matter which Ali Hussain and Ud-din, as participants in the crime, are uniquely qualified to resolve.

The Government contends that the issue is resolved by its sworn statements and by certain demonstrative evidence which was seized in the defendant's bedroom. Even if this Court were to accept the Government's exhibits as full and accurate representations of the deportees' testimony, *see* discussion, *infra*, they would be insufficient to

rebut the presumption of prejudice. In his February 19, 1981 statement, Ali Hussain told INS investigators that when the agents approached the defendant's residence, he, Ali Hussain, woke the defendant up, informed the defendant that he and Ud-din would hide in the bedroom, and asked the defendant not to expose them to the agents. This statement obviously tends to inculpate Tariq.[31] Ali Hussain, however, also admitted that two days prior to this statement, he lied to INS agents in order to avoid arrest. Exhibit 2 to Paper No. 11. The affidavits submitted by the Government also indicate that Ud-din was a tenant in Tariq's residence, and, presumably, had unlimited access to the house. The defendant speculates that Ud-din was harboring Ali Hussain and that the defendant might have been exculpated by the testimony of those aliens. This is a plausible theory demonstrating the loss of a conceivable benefit, and the only evidence to the contrary is the hearsay statements of an admitted liar which were taken in a foreign language and made during uncounseled, custodial interrogations. Such evidence is insufficient to demonstrate the absence of prejudice. Instead, it shows that one deportee was an active participant in the offense and the premature deportation of an active participant raises a presumption of prejudice.

The Government also intends to show that the defendant knew that the illegal aliens were in Ud-din's room by introducing suitcases with tags which bore the names of Ali Hussain and Ud-din and which were found in Tariq's bedroom. On June 15, 1981, this Court denied a fourth amendment motion to suppress the suitcases, holding that they were discovered while in plain view of INS agent Simmons.[32] Obviously,

would be relevant in that it would tend to exculpate the defendant by raising an inference that the alleged conversation never occurred.

**30.** The agents told Tariq that Ali Hussain was an illegal alien; however, they had no reason to inform Tariq that Ud-din was also in an illegal status. Thus, on the second count, there is an additional element of knowledge. As to that count, the Government must also prove that

Tariq knew of Ud-din's illegal status. This issue will be discussed, *infra*.

**31.** It also demonstrates that Ali Hussain was an eyewitness to, and an active participant in, the crime, thereby strengthening the presumption of prejudice.

**32.** *See* n. 22, *supra*.

however, the defendant is prejudiced by the deportation of the owners of the suitcases, because the owners could conceivably benefit him by testifying as to how the suitcases came to be in Tariq's bedroom. For example, Ud-din might say that he had borrowed Ali Hussain and Zahid Hussain's suitcases because Tariq had told him to leave, and that he, Ud-din, had put the suitcases into Tariq's bedroom without Tariq's knowledge. Therefore, the Court holds that the Government's evidence demonstrates that the defendant was prejudiced by the premature deportation of the illegal aliens because the deported aliens were potential eyewitnesses to, and active participants in, the offense charged in the indictment.

The sworn statements offered[33] by the Government are the only indicia of what the deportees would say concerning the facts surrounding the offense with which the defendant is charged.[34] The Court holds that the sworn statements, Exhibits 1–5 in Paper No. 11, are insufficient to rebut the presumption of prejudice, because they are unreliable and because they do not describe the entire transaction.

The unreliability concerns the expiration date of Ud-din's visa.[35] This date is relevant because it tends to show the defendant's knowledge or lack thereof of Ud-din's illegal status[36] and such knowledge is an element of the offense. At the February 19, 1981 interview, the following colloquy between INS and Ud-din reportedly took place.

Q. When and how did you enter the United States and for how long?

A. December 1970, at Kennedy in New York, as xx [initials] a tourist until January 12, 1981. No extensions.

Exhibit 5 to Paper No. 11. This Court relied on Exhibit 5 in denying the motion to dismiss the indictment; however, the defendant renewed his motion to dismiss when, after the first motion hearing, the prosecution provided a Department of Justice show cause order to him. That order, used in Ud-din's civil deportation, showed that Ud-din's visa expired on March 12, 1981; not on January 12, 1981. Because this tended to exculpate the defendant, the Court dismissed the second count. Now, the Government informs the Court that the Department of Justice show cause order was incorrect, and that Ud-din's visa expired on January 5, 1981. Thus, the Government argues that because the exculpatory date of March 12, 1981 was incorrect, the second count should be reinstated.

The Government's argument proves too much, demonstrating the problems of relying on hearsay. In order to utilize the Government's sworn statements, this Court must assume that the deponents fully, accurately, and honestly described the events which occurred and that the agents fully and accurately transcribed the deponents' representations. Here, the defendant is

33. In its opposition to the motion to dismiss, the Government wrote: "In support of its position, the government offers the attached affidavits . . . ." Thus, while the Government did not vouch for the accuracy of the statements, it did proffer them as a reliable description of pertinent events and testimony. *Cf. United States v. Calzada*, 579 F.2d 1358 (7 Cir. 1978), *cert. dismissed*, 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978) (Government unsuccessfully attempted to rely on 12 arrest statements and 6 depositions).

34. The affidavits are hearsay. *Martin-Mendoza*, 499 F.2d at 921; Fed.R.Evid. 801(c). Although, in certain limited circumstances, the Government is permitted to rely on probative secondary evidence, even at trial, *United States v. Loud Hawk*, 628 F.2d 1139 (9 Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980), this Court need not reach that is-

sue, because the instant motions merely present preliminary issues and the Federal Rules of Evidence do not apply to preliminary questions of fact. *See* Fed.R.Evid. 1101(d)(1); 104. The Court will consider the affidavits on the preliminary questions presented, recognizing that they are entitled to less weight than testimony in court.

35. Additionally, Ali Hussain's statement, Exhibit 2 at p. 4, contains minor procedural irregularities which, while possibly unimportant in a civil deportation, are not so easily ignored in a felony proceeding.

36. It is uncontested that Ud-din was an illegal alien. He apparently overstayed his visa and he accepted employment while in the United States on a visitor's visa.

charged with a felony; yet on a matter as simple as a visa expiration date the Government's sworn statements are unreliable.[37] If the documents are inaccurate on concrete items, and at least one of the documents is inaccurate, what errors may have occurred in evaluative representations?[38] This Court declines to speculate on such matters in a criminal action.

Additionally, the five statements taken by INS agents on February 19 and 24, 1981, are incomplete because they do not describe all of the relevant events surrounding the crime, including the seizure of certain demonstrative evidence and the presence of Zahid Hussain in the defendant's residence near the time of the offense charged.[39] The Court is troubled by the fact that the presence of Zahid Hussain did not become known until the INS agents testified at the suppression hearing. Zahid Hussain was not mentioned in any prior affidavit or pleading. While he was apparently merely a fleeting passerby, he was not totally unconnected to the crime, and his presence in the defendant's residence certainly raises some reasonable questions. It appears as if the INS agents unilaterally determined what facts were relevant and did not report to the Court or the defendant that which *they* believed to be irrelevant. While the Court is convinced that those agents acted with the utmost good faith, such activity is a matter of grave concern.[40] The significance of Zahid Hussain is that the tardy revelation of his presence cumulatively[41] demonstrates that the affidavits suffer from the vice of selective reporting. The Court must not be left to speculate as to what other occurrences, if any, were not described in the INS affidavits.[42] For these two reasons the Court holds that the five

37. The Court can only speculate on how many errors have been made. First, in Exhibit 5 to Paper No. 10, the Government reported that Ud-din said that his visa expired on January 12, 1981. The Government now reports, however, that it expired on January 5, 1981. Perhaps Ud-din's memory was faulty, his narration was confused, his perception was erroneous, or he was insincere. If this is the case, then the INS agent accurately recorded erroneous data. On the other hand, perhaps Ud-din gave accurate data which was inaccurately transcribed. Second, the INS agent now reports a clerical error which led to the erroneous show cause order. Third, the January 5, 1981 expiration date which is submitted by the Government is taken from a photocopy of Ud-din's visa; however, the visa issue date on that same exhibit, which is September 22, 1980, conflicts with the visa issue date of October, 1980 which is reported on Government's Exhibit 3 to Paper No. 24. If the visa issue date is subject to uncertainty, the visa expiration date, which is merely an unexplained handwritten notation, is also unreliable.

38. The statements were taken in English without the aid of an interpreter. Because the same INS agents took both Ud-din's and Ali Hussain's statements, all five statements are infected by the same uncertainty.

39. This shortcoming stems from the understandable pressures of the investigation. Nevertheless, it is still an important problem because the affidavits are the only evidence which the Court can rely on in order to rebut the presumption of prejudice.

The Government argues strenuously that the sum and substance of the deportees' testimony, as demonstrated in the sworn statements, is wholly inculpatory. While this may be the case, the statements may be wholly inculpatory because they are incomplete. Furthermore, in *Valenzuela-Bernal*, 647 F.2d at 73–74, the court found a *Mendez-Rodriguez* violation even though Border Patrol interviews with the deported aliens produced no exculpatory data.

40. For example, while the INS agents were acting in good faith, they apparently abrogated the defendant's fifth amendment privilege, *see* n.7 *supra*, and violated Ud-din's fourth amendment rights, *see* n.6, *supra*.

41. The omission is cumulative because, in addition to failing to mention Zahid Hussain, the INS documents also did not mention the three illegal aliens' suitcases.

42. It is the cumulative effect of errors in, and omissions from, the sworn statements, which distinguishes the instant ruling from the ruling on April 28, 1981. On April 28, 1981, the Court was able to rely on the sworn statements of Ud-din and Ali Hussain in finding an absence of prejudice because the Court was ignorant of the existence of the deportees' suitcases, the error in the visa expiration date, and of the presence of Zahid Hussain. Today, the Court, after having been apprised of these errors and omissions, is of the opinion that it cannot rely on the Government's exhibits. Therefore, the instant ruling is not inconsistent with the oral ruling on April 28, 1981.

sworn statements do not rebut the presumption of prejudice.

While Ali Hussain and Ud-din were potential witnesses to, and active participants in, the crime charged, Zahid Hussain probably was not. Therefore, in order to justify a dismissal based on the deportation of Zahid Hussain, the defendant must provide a colorable suggestion of prejudice in the form of a reasonable theory which is set forth in his argument, briefs, or memoranda.

█ The Court is not persuaded that the defendant was prejudiced by the deportation of Zahid Hussain. Zahid Hussain was in Tariq's residence briefly while he was in the custody of INS. The INS agents testified that it was possible that Zahid Hussain and Tariq conversed in Pakistani; however, they remember no such conversation. Zahid Hussain should be considered as merely a fleeting passerby, and it is unlikely that he was an active participant in, or witness to, the offense charged.[43] The defendant has not made a suggestion of prejudice by the deportation of Zahid Hussain.

This Court holds that the defendant, Sheikh Tariq, was presumptively prejudiced, i. e., that he lost a conceivable benefit by the Government's unilateral action in deporting Ali Hussain and Farid Ud-din, illegal aliens who were potential percipient witnesses to, and active participants in, the offense charged, before defense counsel had had notice of the pending deportation and a reasonable opportunity to interview those aliens. Further, the Court holds that the Government has failed to rebut this presumption of prejudice. By separate Order, the Court will dismiss Count I without prejudice, and deny the Government's motion for reconsideration as to Count II.[44]

**43.** The Court states that it is "unlikely" that Zahid Hussain was a participant in the crime because that is the only conclusion which can be drawn from the testimony of the INS agents; however, there is no possible way to determine whether Zahid Hussain would support or contradict this testimony. The Government did not submit any statements from Zahid Hussain.

**44.** The defendant has argued that he was prejudiced because the deportation deprived him of testimony which would be useful to mitigate

his culpability, thereby justifying a lesser sentence, if he is found guilty at trial. Specifically, he argues that the Government's affidavits show that the defendant told Ud-din and Ali Hussain to leave his house, and this conversation would mitigate the severity of his conduct. The Court will not decide this issue because there is sufficient prejudice to the defendant to justify dismissal of the indictment without reaching this issue.